**SHANKS et al. v. WILSON.**
**Civ. No. 245.**

United States District Court
S. D. West Virginia.

Oct. 17, 1949.

Sanders & Smoot, Bluefield, W. Va. (Joseph M. Sanders, and Frank L. Smoot, Bluefield, W. Va.), for plaintiffs.

Richardson & Kemper, Bluefield, W. Va. (George Richardson, Jr., and Paul S. Hudgins, Bluefield, W. Va.), W. R. Broaddus, Jr., Martinsville, Va., for defendant.

MOORE, District Judge.

This action is brought by the plaintiffs to recover from the defendant the sum of $3,-199.12, alleged to be due plaintiffs by way of reimbursement of money paid to defendant by plaintiffs; together with the proceeds of 778.95 tons of coal, alleged to be owing from defendant to plaintiffs on a sliding scale of prices; less $1,132.50 which plaintiffs admit should be credited to defendant and $200 paid by defendant on account of the price of this coal; and interest on the amount claimed from its alleged due date. Of the credit of $1,132.50, $315 is admitted to be owing to defendant as of December 20, 1947, and $817.50 as of July 22, 1948. Defendant's answer denies plaintiffs' claim in its entirety and sets up a counterclaim whereby it is alleged that plaintiff Howard Shanks owes defendant the sum of $2,091.21 as the balance due on a proper statement of accounts between them, including the $1,132.50 for which plaintiffs admit defendant is entitled to credit; and also that defendant is damaged in the sum of $10,000 because of Shanks' alleged default in a coal mining contract which is the basis of the litigation.

All the dealings prior to the institution of suit were between defendant and plaintiff Howard Shanks, and originally the suit was brought by Howard Shanks as sole party plaintiff; but in an amended complaint filed on the day of trial it is alleged that the other plaintiffs, Charlie Hurst, Sr., and Charlie Hurst, Jr., (apparently without knowledge on the part of defendant) were partners with plaintiff Howard Shanks in the particular mining operation which is the subject of the suit, and such allegation is not denied.

Both Shanks and Wilson are engaged in the business of mining coal, but Wilson's specialty is strip mining, whereas Shanks' business is deep mining of coal. Prior to their contract out of which this litigation grows, they had been associated in other operations wherein it was necessary to do both deep mining and strip mining. In the previous operations Shanks had been the principal contractor with the owner of the mine, and Wilson had been his sub-contractor, doing the strip mining. Out of these prior transactions arose a part of the counterclaim which is now made by defendant against plaintiffs.

Winding Gulf Collieries (hereinafter called "Winding Gulf") own a mining leasehold which includes a boundary of coal in Pocahontas No. 3 and Pocahontas No. 6 seams in Mercer County, West Virginia. On May 3, 1948, Winding Gulf entered into a contract with Wilson for the removal by strip mining and deep mining of "all the merchantable coal which can be economically mined and recovered by proper mining methods" from the area covered by the leasehold. Wilson agreed to build at his own expense a side track and ramp to be used by him for the purpose of loading the coal into railway cars, all his interest in which side track and ramp was to become the property of Winding Gulf at the conclusion of operations. However, Winding Gulf agreed that it would reimburse Wilson for the cost of the side track and ramp by the method of reducing the royalties charged on the coal mined by Wilson in the amount of 10¢ per ton until the cost of the side track and ramp had been fully repaid to Wilson. To this end it was provided that such royalty to be paid to Winding Gulf would be 83¢ per net ton until Wilson should be fully reimbursed for the cost of the side track and ramp,

and 93¢ thereafter. Other provisions as to royalty were (1) that if it were necessary for Wilson to obtain additional surface rights on any of the land (which, if done, was to be at Wilson's cost), the royalty for all coal mined from such land should be 83¢ instead of 93¢, and (2) that the royalty on coal sold at a price between $6.50 and $12 per net ton should be 16 percent of the sales price, and upon coal sold above $12 per net ton, 25 percent of the sales price. The contract was to run "until all of the coal which can be recovered by proper mining methods has been removed and delivered, or until such mining shall cease to be profitable to the owner or the contractor."

After entering into the foregoing contract with Winding Gulf, Wilson, on May 20, 1948, contracted in writing with Shanks to act as Wilson's sub-contractor in performing that part of the work of removing the coal from the Winding Gulf leasehold which required deep mining methods. In this contract between Wilson and Shanks the contract between Wilson and Winding Gulf is referred to several times. The former is, in fact, based almost entirely on the latter. Shanks agreed "to mine and remove by deep mining all of the merchantable coal which can be mined and recovered by proper mining methods" from the two seams on the leasehold in question "which shall remain after the strip mining operations of the Operator" (Wilson) "under the provisions of the aforesaid contract" (the contract between Wilson and Winding Gulf). Shanks was to follow the strip mining operations of Wilson "as closely as may be possible under approved mining methods." The contract was to "remain in force so long as the aforesaid contract between Winding Gulf Collieries and the Operator" (Wilson) "is in force, or until all of the aforesaid coal which can be recovered by proper deep mining methods has been removed and delivered."

It was provided that if Shanks should fail for thirty days to perform any provision of the agreement after notice, or if Wilson should fail to pay Shanks for coal mined by him when payment was due, the agreement might be terminated by the aggrieved party.

The contract between Wilson and Shanks contained the following provision with reference to the side track and ramp which has already been spoken of in connection with the contract between Wilson and Winding Gulf: "It is understood and agreed between the parties hereto that the aforesaid contract between the Operator and Winding Gulf Collieries requires the Operator to build a side track from the Norfolk & Western Railway Company's line, and a ramp to be used in loading the aforesaid coal. The Contractor agrees, upon notice from the Operator to pay to the Operator one-half of the cost of construction of such side track and ramp, the portion to be paid by the Contractor being Three Thousand One Hundred Ninety-Nine and 12/100 Dollars ($3,199.12). Contractor also agrees to pay, upon notice from the Operator, one-half of the annual rental owing to the Norfolk & Western Railway Company for the said side track, the portion to be paid by the Contractor annually being Three Hundred Forty-Nine and 16/100 Dollars ($349.16). Contractor also agrees that if delivery of coal by him to the said ramp, as hereinafter provided, should interfere with the delivery of coal from the strip mining operations being carried on by the Operator, the Contractor will pay one-half of the cost of building an additional ramp, at a site to be selected by the Operator; the other one-half of the cost of said ramp to be paid by the Operator."

The coal mined and delivered by Shanks was to be paid for by Wilson according to a sliding scale based on the net sales price received for the coal when sold by Winding Gulf. The minimum price per ton was $2.75, which was to be paid per net ton for all coal sold by Winding Gulf at a price between $4 and $4.49. The scale was increased in the amount of 25¢ for each 50¢ increase in sales price up to the figure of $10, and for all coal sold for $10 or more the price to Shanks was fixed at $5.75 per net ton.

Shanks paid to Wilson at the time the contract was executed the sum of $3,199.12, the amount specified in the contract to be paid as one-half the cost of the ramp and

2

793

siding. Wilson testified that he actually expended for building the ramp and siding the sum of $9,229.73. A statement in this amount was submitted by Wilson to Winding Gulf and accepted by Winding Gulf as a basis for reimbursement to Wilson of the cost thereof, by means of the 10¢ per ton differential in the royalty.

During Shanks' operations under the contract, he mined and delivered 778.95 tons of coal which was sold by Winding Gulf at various prices, a calculation of which is hereinafter set out. Wilson has paid to Shanks only $200 on the contract price for this coal.

All but 45 tons of the coal mined and delivered by Shanks was taken from the Number 3 seam. There came a time when the coal from this seam could no longer be sold at a profit. Winding Gulf, through which company the coal was sold, therefore refused to handle more of it. From that time on there could not be said to be in Number 3 seam any merchantable coal. There was and is, however, a large quantity of merchantable coal left in the Number 6 seam which could be and can be profitably removed by proper deep mining methods. As to this Number 6 seam of coal, Shanks, prior to the spring of 1949, did no deep mining for the reason that Wilson had not made room for him to conduct deep mining operations in this seam; and for the further reason that the parties were in a dispute as to the accounts between them, Shanks demanding payment for coal delivered, and Wilson contending that Shanks owed him more than enough to offset the amount due for coal. On March 16, 1949, Shanks wrote Wilson saying, among other things, that he did not want to "continue business" with him any longer; but Wilson refused to release Shanks from the contract, and on April 20, 1949, we find Shanks discussing with Wilson the advisability of Shanks' going ahead with deep mining in the Number 6 seam. These discussions were renewed even after the bringing of this action by Shanks, but for some reason, not clearly explained, nothing was ever done along this line. The entire course of dealing gives rise to a strong suspicion that Shanks wished to shake off the obligations of his contract with Wilson because he had become discouraged at the outlook in the coal business, which in the early part of 1949 was more gloomy than it had been in the spring and summer of 1948. Wilson, however, has never consented to release Shanks from his contract. On the other hand, Wilson did not in the trial of this case introduce any substantial evidence from which I can conclude that he has suffered any calculable damage by reason of Shanks' failure to go ahead with deep mining operations.

Wilson's counterclaim against Shanks consists in part of the difference between $3,199.12, the amount actually paid to Wilson by Shanks on the cost of the ramp and siding, and one-half the total amount which Wilson says he actually expended in the construction thereof. The remainder of the counterclaim, aside from the amount claimed as damages for alleged default by Shanks in the performance of the mining contract, and the item of $817 charged to Shanks for work in opening a road, which Shanks admits he owes Wilson, consists of various sums which Wilson has charged against Shanks and which he testified were due to him from Shanks on dealings between them in prior mining operations in which they were engaged. Wilson also charges against Shanks the sum of $350.74 as one-half the annual rental paid or to be paid to Norfolk & Western Railway Company for the side track. It is to be noted that the payment of $3,199.12 already made by Shanks to Wilson included, according to the evidence, Shanks' one-half of the first year's rental of the side track.

With reference to the counterclaims made by Wilson covering various items of account between him and Shanks which he alleges were owing to him by Shanks prior to their engaging in the work of mining coal on the Winding Gulf leasehold: the evidence being contradictory, I find that Shanks did not owe Wilson any of these sums, other than the item of $315, admitted by Shanks.

Shanks' claim against Wilson for reimbursement of the $3,199.12 paid to

Wilson by Shanks as one-half of the construction of the side track and ramp cannot be sustained under the circumstances of this case. There is nothing in the language of the contract between Wilson and Shanks hereinbefore quoted which shows any intention of the parties that this sum or any part of it should ever be repaid. The fact that Wilson, by means of a concession in the rate of royalty which he was able to secure from Winding Gulf, has provided for reimbursement to himself of the total cost of the ramp and siding does not, in my opinion, create any right, equitable or otherwise, in Shanks to recover what he has paid Wilson under the contract. The situation as I see it is simply this: Wilson, having the exclusive right to use the ramp and siding (the construction cost of which was paid by him, though he either has been or is to be reimbursed in the full amount of this cost by concessions in the royalties) gives to Shanks the concurrent right to use them for the delivery of coal mined by Shanks under the contract between Wilson and Shanks. As a consideration for this right, Shanks agrees to pay, and does pay to Wilson, $3,199.12. Shanks says in his testimony that he knew nothing about the provisions of the contract between Wilson and Winding Gulf whereby Wilson was to be reimbursed for the cost of the ramp and side track. Wilson testifies, to the contrary, that Shanks was well aware of all such provisions. The entire contract of Wilson with Shanks having been keyed to that between Wilson and Winding Gulf, it seems unlikely that Shanks would not have been thoroughly familiar with the contents of the latter contract. However that may be, it is my opinion that it is immaterial whether Shanks knew about those provisions or not. The language of his contract with Wilson is clear and unambiguous, and the Court will not substitute some other agreement for the one which is clearly expressed. See Kanawha Banking & Trust Co. v. Gilbert, W.Va., 46 S.E.2d 225; Weekley v. Weekley, 126 W.Va. 90, 27 S.E.2d 591, 150 A.L.R. 689; Motor Car Supply Co v. General Household Utilities Co, 4 Cir., 80 F.2d 167; Red Jacket Oil and Gas Co. v. United Fuel Gas Co., 4 Cir., 146 F.2d 645.

It is contended by counsel for Shanks that Wilson should be required to render back the amount paid to him by Shanks upon the theory either of an implied contract on the part of Wilson to do so; or a quasi contract; or unjust enrichment.

To hold that there was an implied contract to repay the money to Shanks in case of reimbursement to Wilson, the Court must believe that such was the intention of the parties, though not expressed in the writing signed by them. Carper v. United Fuel Gas Co., 78 W.Va. 433, 89 S.E. 12, L.R.A.1917A, 171; Leckie v. Bray, 91 W.Va. 456, 113 S.E. 746. There is no circumstance which would indicate to the Court that such was their intention. Nor can I find grounds for holding that a quasi contract has been established. It is true that there may be circumstances in which the law requires a person to do an act or pay a sum of money though he has made no contract to do so, and even though it may be against his will. In such circumstances the legal fiction employed is that the person from whom the performance is exacted is obligated by law to do the act required in order that justice may be done, and fraud or other wrong doing prevented. This is the so-called "quasi contract." Johnson v. National Exchange Bank of Wheeling, 124 W.Va. 157, 19 S. E.2d 441; G. T. Fogle & Co. v. United States, 4 Cir., 135 F.2d 117. I can think of no situation, however, in which, fraud or mistake being absent, a Court would undertake to impose the obligation of a quasi contract when the parties have clearly and plainly expressed in writing the actual contract between them.

As to unjust enrichment, this principle is applicable only in those cases in which one person has in his possession money or property which has come into his hands under circumstances which make it unjust for him to retain it, and which in equity and good conscience belongs to some other person. Johnson v. National Exchange Bank, supra; Lockard v. City of

Salem, 130 W.Va. 287, 43 S.E.2d 239; Ross Engineering Co. v. Pace, 4 Cir., 153 F.2d 35. The situation between Wilson and Shanks does not call for the application of this principle. The $3,199.12 paid by Shanks to Wilson was paid to discharge Shanks' obligation under the contract. But for the fact that Wilson got from Winding Gulf a concession in royalties which covered the entire cost of the side track and ramp, Shanks would in all probability be making no claim for repayment of the sum paid by him. The mere fact that Wilson got this rebate imposed, as I see it, no obligation on him, legal or equitable, to pay any part of it to Shanks. The contract between Wilson and Shanks must be viewed as a whole. We cannot say that the payment of $3,199.12 was not taken into consideration in fixing the sliding scale of prices to be paid to Shanks for coal mined by him. Wilson had certain advantages and disadvantages under his contract with Winding Gulf. In like fashion, Shanks had advantages and disadvantages under his contract with Wilson. The two contracts were doubtless executed by the respective parties after negotiations in which, as is usually the case, each party contended for concessions, and the completed contracts resulted from a compromise between the conflicting demands of the respective parties. This is the classical pattern followed in the framing of contracts. We cannot say that a provision in one of these contracts is to be changed, altered or abrogated because some provision in the other contract gives to or withholds from one of the parties some advantage over the other. The reference in the contract between Shanks and Wilson to the side track and ramp provision of Wilson's contract with Winding Gulf was made solely for the purpose of showing that Wilson was obligated to construct the side track and ramp. In the absence of a specific incorporation of the reimbursement provisions of the Winding Gulf contract, such provisions can have no effect upon the contract between Shanks and Wilson. The law on this point is well settled in this Circuit. In General Contracting Corp. v. United States, 4 Cir., 70 F.2d 83, at page 85, a case originating in this District, Judge Soper said: "The rule, established by Guerini Stone Co. v. P. J. Carlin Const. Co., 240 U.S. 264, 277, 36 S. Ct. 300, 306, 60 L.Ed. 636 (and see Woodruff v. Hough, 91 U.S. 596, 602, 23 L.Ed. 332; Ingram-Day Lumber Co. v. McLouth, 275 U.S. 471, 48 S.Ct. 153, 72 L.Ed. 378), is that 'in the case of subcontracts, as in other cases of express agreements in writing, a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified.'"

For all the foregoing reasons, I must deny Shanks' claim to reimbursement from Wilson of the sum of $3,199.12 paid by him under the provisions of his contract.

■ Wilson contends that Shanks has defaulted in the performance of the contract, and that he, Wilson, is entitled to damages as a result thereof. As to this contention, I conclude (1) that there was no obligation on Shanks to continue mining in the Number 3 seam, because there was no merchantable coal left therein; (2) that Shanks was and still is bound to carry out the obligations of the contract by deep mining the merchantable coal in the Number 6 seam after reasonable notice by Wilson so to do; but that (3) not having proved in this action any calculable damages, Wilson is not entitled herein to any judgment therefor.

■ It is argued that Wilson gave Shanks cause for terminating the contract by failing seasonably to pay him for coal mined and delivered. This argument is answered by the fact that at no time did Shanks claim any right to terminate the contract on this ground, but on the contrary, as late as the spring of 1949, recognized the continued existence of the contract by conferring with Wilson on a proposed plan to renew operations under it. Moreover, Wilson withheld payment, not because he denied liability therefor, but because he claimed Shanks owed him more than enough to offset the amount due for coal. It is not until the decision in this case is rendered that this disputed claim is

settled, for the most part in favor of Shanks. Under these circumstances non-payment could not be made the basis of unilateral termination.

■■■ Wilson asserts a claim against Shanks for $350.74 to cover Shanks' one-half part of the annual rental due Norfolk & Western Railway Company for the side track. The proper amount, as set out in the contract, is $349.16. The second annual installment of rent was due from Shanks on May 20, 1949. Therefore, Wilson is entitled to credit for this sum as of that date.

Shanks is entitled to recover from Wilson the unpaid amount due for coal mined and delivered by Shanks, calculated according to the sliding scale set up in the agreement between Wilson and Shanks. The total tonnage delivered, as has been stated, was 778.95 net tons. This is subject to a deduction of 20¢ per ton to cover payments to the Miners' Welfare Fund, as provided in the contract. The sales price of the coal was as follows: 94 tons at $2.75, 25 tons at $3.50, 130.55 tons at $4, and 529.40 tons at $4.25. A calculation in accordance with these figures produces the sum of $2,962.34, and this sum is subject to a deduction of $200 which was paid by Wilson to Shanks on account.

Shanks admits in his complaint that Wilson is also entitled to credits from Shanks in the total amount of $1,132.50; and, as I have found, Wilson is entitled also to credit for $349.16, the amount due from Shanks as his one-half part of annual rental of the side track.

In accordance with all of the foregoing, judgment will be rendered in favor of Shanks and against Wilson in the sum of $1,280.68, plus interest on past due payments for coal mined and delivered. This interest should be computed by reference to the respective dates and tonnages, which are not in dispute between the parties; and should be so calculated as to give proper credit for the sums making up the aforesaid total of $1,132.50.

An order may be presented for entry in accordance with this opinion.