

Heard L. Floore, U. S. Atty., A. W. Christian, Asst. U. S. Atty., Fort Worth, Tex., for the Government.

Benjamin L. Bird, Fort Worth, Tex., Joseph B. Brennan, Atlanta, Ga., Willis B. Snell, Washington, D. C., for defendant.

ESTES, District Judge.

The above case having been tried before the Court without a jury, and the Court having considered the pleadings, stipulations, evidence, and the briefs and arguments of counsel, the Court makes the following findings of fact and conclusions of law, all of which findings and conclusions are applicable to each of plaintiff's taxable years 1951, 1952, and 1953, unless otherwise expressly indicated.

**ACME BRICK COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 3313.**

United States District Court
N. D. Texas,
Fort Worth Division.

Dec. 14, 1956.

### Findings of Fact

1.

Plaintiff is a corporation incorporated and doing business under the laws of the State of Texas, with its principal place of business at Fort Worth, Texas, within this District and Division.

2.

This action is brought by plaintiff against defendant pursuant to Section

1346(a) (1) of Title 28 of the United States Code, Act of June 25, 1948, c. 646, 62 Stat. 869, 933, as amended by the Act of July 30, 1954, c. 648, Section 1, 68 Stat. 589, and is for the recovery of income tax and excess profits tax, and interest thereon, collected from plaintiff by defendant for plaintiff's taxable years 1951, 1952, and 1953.

**3.**

Plaintiff keeps its books on the accrual method basis of accounting on a calendar year basis.

**4.**

Within the time prescribed by law, plaintiff filed its federal income tax returns for 1951, 1952 and 1953, and paid the tax liability shown as due thereon.

**5.**

Deficiencies in income and excess profits taxes for the years 1951–1953, proposed in an Internal Revenue Agent's Report, together with interest thereon, were paid by plaintiff in the following amounts on the following dates:

1951: $190,598.09, with interest of $30,557.72, by a cash payment of $214,187.09 on September 10, 1954, and by a credit on December 23, 1954, of $6,968.72 for an overpayment of stamp tax; and $278,979.76, together with interest of $57,190.85, by a cash payment of $336,170.61 on August 15, 1955.

1952: $150,362.29, with interest of $13,423.44, by a cash payment of $163,785.73 on September 10, 1954; and $148,893.59, together with interest of $21,589.57 by a cash payment of $170,483.16 on August 15, 1955.

1953: $42,126.06, with interest of $1,233.20, by a cash payment of $43,359.26 on September 10, 1954; and $127,691.50, together with interest of $10,853.78, by a cash payment of $138,545.28 on August 15, 1955.

**6.**

Plaintiff owns and operates clay pits, and is engaged in the business of extracting clay from such pits and making brick and tile and, in the case of the pit at Perla, Arkansas, fire brick and other refractory products, from such clay in plants which are located near each of the pits.

**7.**

The Revenue Agent's Report referred to above allowed plaintiff a depletion deduction for its clay pits in the following amounts:

| | |
|---|---|
| 1951: | $ 103,408.31 |
| 1952: | 112,532.95 |
| 1953: | 82,702.08 |

**8.**

On August 19, 1955, plantiff filed claims for refund of income and excess profits taxes for 1951, 1952 and 1953. Such claims for refund were each amended on March 9, 1956. Previously, on August 3, 1954, plaintiff had filed a claim for refund for 1951, claiming a refund of excess profits tax for such year, on the basis of a carry-back to 1951 of an unused excess profits tax credit for 1952. Such claims for refund set forth the grounds and reasons upon which this suit was brought by plaintiff.

**9.**

On May 24, 1956, the Commissioner of Internal Revenue mailed by registered mail notices of disallowance of the claims for refund for 1951, 1952 and 1953, filed on August 19, 1955, and amended on March 9, 1956. On September 8, 1955, the Commissioner mailed by registered mail a notice of disallowance of the claim for 1951 filed on August 3, 1954. This suit was filed on May 26, 1956.

**10.**

During the years 1951–1953, all of the clay which plaintiff extracted from its pit at Perla, Arkansas, had a pyrometric cone equivalent of 31 and all of the clay which plaintiff extracted from its pit located at Denton, Texas, had a pyrometric cone equivalent of not less than 20. All such clay extracted at Perla and Denton was suitable for use in making fire brick and other refractory products and was refractory and fire clay.

11.

All of the clay extracted by plaintiff from its pits other than those at Perla and Denton during the years 1951–1953 was brick and tile clay.

12.

The following are the processes applied by plaintiff to the raw brick and tile clay and raw refractory and fire clay in order to put it in the form of burnt brick and tile and fire brick:

(a) The clay is extracted from the ground and transported from the clay pit to the nearby brick plant.

(b) After it has been removed from the ground, some of the clay is weathered in storage sheds.

(c) The clay is crushed and ground to such fineness that it will pass through various mesh screens.

(d) Some of the clay mined at Denton, Perla, and Garrison, Texas, is calcined in a rotary or other kiln. The calcining is done before the final grinding of the clay, and the calcined clay is mixed with other clay in order to help drying and reduce the shrinkage of the brick and tile in the subsequent burning. At Perla, defective burnt bricks are reground and also added to the raw clay to reduce shrinking. Flint clay is added to plaintiff's fire clay in making two types of fire brick at Perla.

(e) The clay is next formed in the shape of brick and tile by one of the following three methods:

(1) By the "stiff mud" process, whereby the clay is mixed with water in the pug mill in order to temper the clay, is forced under pressure through various types of dies in long ribbons, and is cut into clay units of the desired size. In some cases, before the clay is extruded, it passes through an evacuation chamber where air is evacuated from the clay by a vacuum pump.

(2) By the "soft mud" process, whereby the clay is mixed with water in the pug mill, is then placed in molds of the desired shape and size, and is then removed from the molds. More water is added in the pug mill than is added in the case of the stiff mud process.

(3) By the "dry press" method, whereby the clay is mixed with only a small amount of water and is then pressed by machinery into the shape of brick. In the case of one type of fire brick, the clay is extruded as a stiff mud brick and is dried, as described in subparagraph (f). It is then reground and shaped by the dry press method.

(f) After the clay has been formed in the shape of brick and tile, the clay units formed by the stiff mud and soft mud processes are placed in dryer tunnels, where free water is evaporated from the clay units by the application of heat. When the dry press method is used, a preliminary heating, before the burning, is applied in the kiln to dry the clay units.

(g) After the drying, the clay units are burned in kilns.

(h) The burnt brick and tile are then removed from the kilns.

(i) After it has been removed from the kilns, the burnt brick and tile are stocked and loaded for shipment to purchasers.

13.

The processes applied by plaintiff to its brick and tile clay and refractory and fire clay in order to put such clay in the form of burnt clay products are usual and ordinary ones by which brick and tile clay and refractory and fire clay normally and general are extracted from the ground and processed into burnt brick and tile and burnt fire brick.

14.

Plaintiff sells the brick and tile clay which it extracts from the ground only in the form of burnt brick and tile. Plaintiff has no opportunity to sell any of its brick and tile clay before it is put in the form of burnt brick and tile. Of the brick and tile clay mined in the United States, there is opportunity for sale of only a negligible quantity before it is put in the form of burnt brick and tile and kindred products. Both in plaintiff's market area and in the United

States as a whole, owners and operators of brick and tile clay pits normally must process their clay into burnt brick, tile or kindred products in order to obtain a product which is commercially marketable.

15.

Plaintiff is able to sell the refractory and fire clay which it extracts from its pits at Perla and Denton only in the form of burnt brick and tile and burnt fire brick, except for a small amount extracted at Perla which plaintiff is able to sell in the form of other refractory products. Such other refractory products consist of ground fire clay (called dry milled fire clay) sold as a mortar mix in laying up fire brick, and miscellaneous products sold for special refractory purposes. The quantity of refractory and fire clay sold for use as a mortar mix and for other refractory purposes is less than 2% of the refractory and fire clay mined by plaintiff. Less than 1½% of the refractory and fire clay mined by plaintiff is sold in the form of dry milled fire clay. All of the miscellaneous refractory products other than dry milled fire clay are subjected to processes other than those applied to make brick and tile or fire brick from the clay. The processes which plaintiff applies to produce the refractory products other than fire brick are usual and ordinary ones by which such products are normally and generally made.

16.

Plaintiff is able to sell less than 2% of the refractory and fire clay which it extracts from the ground before the clay is put in the form of burnt clay products. Before the refractory and fire clay which plaintiff extracts from the ground is put in the form of burnt clay products, plaintiff has no opportunity to sell more than a negligible quantity of such clay.

17.

Before their clay is put in the form of burnt clay products, refractory and fire clay mine owners and operators in plaintiff's market area have no opportunity to sell more than a negligible quantity of their clay.

18.

In the United States as a whole, more than 75% of the refractory and fire clay mined has to be put in the form of burnt clay products before it can be sold.

19.

In the United States as a whole, more than 90% of the refractory and fire clay mine owners and operators are required to put their clay in the form of burnt clay products in order to be able to sell such clay.

20.

Both in plaintiff's market area and in the United States as a whole, fire clay mine owners and operators normally are required to put their clay in the form of burnt clay products in order to obtain products which are commercially marketable.

21.

During the years 1951–1953, the selling price of plaintiff's dry milled fire clay in bulk was as follows:

| Period | Price Per Ton |
|---|---|
| Jan. 1, 1951 to Sept. 22, 1952 | $ 13.75 |
| Sept. 23, 1952 to July 7, 1953 | 14.40 |
| July 8, 1953 to Dec. 31, 1953 | 16.00 |

22.

The burnt brick and tile, burnt fire brick and other refractory products produced by plaintiff are mineral products.

23.

For each of the years 1951–1953, the sum of 15% of the net sales of the products produced by plaintiff at Perla and Denton and 5% of the net sales of products produced by plaintiff at its other plants, limited to 50% of the net income from the sales of products produced from each property, is as follows:

| | |
|---|---|
| 1951 | $575,410.94 |
| 1952 | 464,262.08 |
| 1953 | 345,924.85 |

Conclusions of Law

1.

This Court has jurisdiction of the parties and subject matter in this case,

and all the procedural requirements for bringing this suit have been met.

### 2.

The clay extracted by plaintiff from its pits at Perla, Arkansas, and Denton, Texas, during the years 1951–1953 was "refractory and fire clay" within the meaning of Section 114(b) (4) (A) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 114(b) (4) (A), and plaintiff is entitled to a deduction for depletion for each such pit under that section and Section 23(m), 26 U.S.C.A. § 23(m), computed at the rate of 15% of its "gross income from the property", limited in the case of each property to 50% of the net income from such property.

### 3.

The clay mined by plaintiff from all of its other clay pits during the years 1951–1953 was "brick and tile clay" within the meaning of Section 114(b) (4) (A) of the Internal Revenue Code of 1939, and plaintiff is entitled to a deduction for depletion for each such pit under that section and Section 23(m), computed at the rate of 5% of its "gross income from the property", limited in the case of each property to 50% of the net income from such property.

### 4.

All of the processes applied by plaintiff to its brick and tile clay and refractory and fire clay in order to obtain burnt brick and tile, burnt fire brick and plaintiff's other refractory products are, within the meaning of Section 114(b) (4) (B) of the Internal Revenue Code of 1939, "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products".

### 5.

In computing its federal income tax for each of the years 1951–1953, plaintiff is entitled to a depletion deduction equal to 15% of the net sales of its burnt brick and tile, burnt fire brick and other refractory products produced at Perla and Denton, but limited in each case to 50%

of its net income from such sales of products produced from each property.

### 6.

In computing its federal income tax for each of the years 1951–1953, plaintiff is entitled to a depletion deduction equal to 5% of the net sales of its burnt brick and tile produced from each of its properties other than those at Perla and Denton, but limited in each case to 50% of its net income from such sales of products produced from each property.

### 7.

Plaintiff has overpaid its federal income and excess profits taxes for the years 1951–1953, and is entitled to a refund for each of such years, together with interest paid thereon and interest thereon as provided by law, together with costs, such refund to be computed by allowing plaintiff an additional deduction for depletion in each year in the following amount:

| | |
|---|---|
| 1951 | $472,002.63 |
| 1952 | 351,729.13 |
| 1953 | 263,222.77 |