The **SPARTA CERAMIC COMPANY,**
Plaintiff,

v.

**UNITED STATES** of America,
Defendant.

**Civ. A. No. 32342.**

United States District Court
N. D. Ohio, E. D.

Nov. 12, 1958.

**402**

Henry J. Fox, Albert E. Arent, Washington, D. C., John L. Cable, Lima, Ohio, for plaintiff.

Sumner Canary, U. S. Dist. Atty., Cleveland, Ohio, Charles K. Rice, Asst. Atty. Gen., James P. Garland, Lyle M. Turner, Washington, D. C., Peter J. Donahue, Riverdale, Md., for defendant.

WEICK, District Judge.

This action is for refund of income and excess profits taxes, in the amount of $74,436.27, which are alleged to have been erroneously and illegally collected for the year 1951.

The taxpayer is an Ohio corporation engaged in the business of mining clay and shale and manufacturing floor and wall tile therefrom. Its mines and plant (which was adjacent thereto) are located at Sparta, Ohio.

Taxpayer claims that it overpaid its taxes by reason of the failure of the Commissioner of Internal Revenue to allow an additional deduction for percentage depletion of clays and shale extracted from its mines.

The deduction for depletion was controlled by Section 114(b) (4) of the Internal Revenue Code of 1939, which provided:

"(A) *In general.* The allowance for depletion under section 23(m) in the case of the following mines and other natural deposit shall be—

"(i) in the case of * * * brick and tile clay, shale, * * * 5 per centum, * * * of the gross income from the property during the taxable year, * * *.

"(B) *Definition of gross income from property.* As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills

in which the ordinary treatment processes are applied thereto * * *." 26 U.S.C. § 114(b) (4).

In its income tax return for the year 1951, taxpayer claimed a percentage depletion allowance for clays and shale, extracted from its mines, of $6,239.52, which was computed by including in its gross income only those expenses allocable to treatment processes prior to the introduction of the clay into the pug mill. The Commissioner of Internal Revenue accepted this computation.

In its refund claim, however, taxpayer has included additional income allocable to subsequent manufacturing processes used to convert the raw clay into the finished product—glazed and unglazed tile, and also for mounting and packaging the same for shipment. Thus, practically, taxpayer is claiming the sales price of its products f. o. b. plant loaded for shipment as the proper depletion base. The total gross income of taxpayer for the year 1951 from the sale of its tile was $2,317,461.39. Taxpayer took 5% thereof, which amounted to $115,873.07, as the amount of depletion it was entitled to deduct, rather than the $6,239.52 which it originally claimed, and this resulted in the instant claim for refund of $74,436.27 plus interest.

The steps taken by taxpayer in the production of tile from its clay were:

(a) The clay in the mines was drilled and dynamited loose, and the clay in the pit was mined by hand shovel. The clay was loaded into cars which were pulled by mules on tracks from inside the mine or from the pit to plaintiff's plant.

(b) The clay was dumped in the grinding shed at one end of plaintiff's plant.

(c) The clay was hand loaded onto a dry pan crusher at one end of the grinding shed where it was ground. It was transported by conveyor belt from the dry pan crusher to a screen and from there to storage bins.

(d) From the storage bins it was either transported by conveyor belt to the pug mill where the clay was extruded in clay ribbons and cut into the desired lengths by hand cutters, or was loaded into hoppers which dropped it to the dry presses where it was hand loaded into molds and pressed into the desired shapes. Some of the extruded clay was reground and taken by wheelbarrow to the storage bins for use in the dry presses.

(e) The clay units were then loaded by hand into cars which pass through a drying room.

(f) Some of the extruded clay units passed on a conveyor belt under a nozzle which sprayed on a glaze mixture.

(g) The clay units were then placed on kiln cars and were fired in the kiln.

(h) After the kiln operation, the larger tile was sorted by hand so as to discard defective and non-salable tile, and the salable tile was packed for shipment. The smaller units were mounted, that is inspected, placed in pattern, and had sheets of paper affixed to them to hold them in place.

Taxpayer claims that all the aforesaid steps are "ordinary treatment processes" within the purview of the statute and that the tile in its final state, as described in Step (h) is "the commercially marketable product" upon which the 5% allowance should be based.

The Government, on the other hand, contends that the clay was fire clay and a commercially marketable product when it reached the stage described in Step (c). As alternative contentions the Government claims (1) that the fire clay could be used to manufacture common brick and therefore the depletion allowance should be based on hypothetical sales of common brick as the commercially marketable product, or (2) that the cost of non-ordinary treatment processes should be excluded from the tax

base, if it be found that finished tile is the commercially marketable product.

At the outset, the term "commercially marketable" must be defined.

■ Taxpayer equates "commercially marketable" with "economically feasible", and adopts the view that before a product is commercially marketable there must be the prospect of substantial sales with the possibility of a profit being made thereby.

The Government's theory on the definition of this term is that it means only salable or fit to be offered for sale in business intercourse.

Both logic and the decided cases support the taxpayer's interpretation.

Websters' New International Dictionary (2nd Ed.) defines "commercial" as:

"1. Of or pertaining to commerce * * *

"2. Having financial profit as the primary aim".

"Marketable" is defined as:

"1. Fit to be offered for sale in a market; * * *

"2. Wanted by purchasers, saleable; * * *"

Thus, "marketable" can be said to be "saleable, or fit to be offered for sale in a market", which is exactly the definition the Government wishes to ascribe to "commercially marketable". The fallacy of this desired interpretation is the failure to include the profit making aspect, "commercial".

Taxpayer's interpretation of commercially marketable is to be found embodied in the decision in Arvonia—Buckingham Slate Co. v. United States, Va., 1958, 167 F.Supp. 903. Therein it was held that slate, at the time it was separated from the seam, was not commercially marketable even though it could have been sold for 10 cents a ton, much below the cost of extracting it. Cf. Hay v. Shell Petroleum Corp., D.C. W.D.Okl.1939, 30 F.Supp. 663, 667; Shanks v. Wilson, D.C.S.D.W.Va.1949, 86 F.Supp. 789, 793.

■ Was the clay and shale extracted by taxpayer a commercially marketable product in its natural state?

The evidence showed that most clay tile manufacturers in taxpayer's vicinity located their operations near natural deposits and were self-sufficient in obtaining clays and shale. Their objective was to control the quality and uniformity of the crude clays and shales and thereby avoid manufacturing difficulties which might result from variations in the raw clays, and to insure continuity of supply.

The Government did introduce evidence that 350,000 tons of fire clays and 38,513 tons of shale were sold in 1951 within a fifty mile radius of plaintiff. However, 200,524 tons of the clay sold was of a special variety used in steel mills for purposes for which the plaintiff's clay was not suitable. The remaining 150,176 tons were sold at prices and under conditions which would not have been economically feasible for plaintiff. Therefore, clay and shale cannot be considered to have been plaintiff's first commercially marketable product.

■ The Government's contention that natural clay is the first commercially marketable product of a clay tile producer has been presented a number of times before, and uniformly rejected. United States v. Merry Bros. Brick & Tile Co., 5 Cir., 1957, 242 F.2d 708, certiorari denied 1957, 355 U.S. 824, 78 S.Ct. 31, 2 L.Ed.2d 38; Cobb v. Chattahoochee Brick Co., 57-1 U.S.T.C. Par. 9614 (CA 5, 1957) certiorari denied United States v. Merry Bros. Brick & Tile Co., 355 U.S. 824, 78 S.Ct. 31, 2 L.Ed.2d 38; United States v. Sapulpa Brick & Tile Corp., 10 Cir., 1956, 239 F.2d 694; United States v. Cherokee Brick & Tile Co., 5 Cir., 1955, 218 F.2d 424, certiorari denied United States v. Merry Bros. Brick & Tile Co., 355 U.S. 824, 78 S.Ct. 31, 2 L.Ed.2d 38; Acme Brick Co. v. United States, D.C. N.D.Texas, 1956, 167 F.Supp. 911; Haviland Clay Works Co. v. United

States, 56–1 U.S.T.C. Par. 9295 (D.C. N.D.Ohio, 1956) Cf., Arvonia-Buckingham Slate Co. v. United States, supra; Riverton Lime & Stone Co. v. Commissioner, No. 49, 1957, 28 T.C. 446.

■ The Government's first alternative defense is that the taxpayer should compute its percentage depletion amounts on the sales price of common brick as its first commercially marketable mineral product. Treasury Regulations 111, Section 29.23(m)–1(f).

Plaintiff did not in 1951, and does not now, manufacture brick. Expert testimony was given that in 1951 plaintiff could not have processed its clays and shale into ordinary brick on a commercial basis with its then existing physical facilities, and that certain characteristics of plaintiff's clays rendered them unsuitable for processing into brick on a commercial basis.

Thus the Government is arguing that the depletion allowance should be based on a product which plaintiff did not and could not, on a commercially marketable basis, produce. The lack of merit of this position in the face of the regulation which predicates the deduction on the producer's first commercially marketable product is obvious.

■ As its second alternative defense, the Government contends that certain processes applied to the manufacture of tile should not be considered ordinary treatment processes, and their value excluded from the depletion base. The processes which the Government contends are non-ordinary are (1) addition of body additives (2) glazing (3) dry pressing (4) mounting tile on paper backings and (5) packaging for shipment.

The use of additives would appear to be an ordinary process applied to obtain a commercially marketable product. Although not all of the tile produced by plaintiff contained body additives, expert testimony was given that in those instances in which it was used it was necessary to do so to avoid undesirable scumming effects resulting from certain clay mixtures, and that this was a normal practice in the industry.

The question of whether glazing is an ordinary and necessary process is a more difficult one. It cannot be denied that it is a treatment process, as it effects a physical change in the product. The Government contends that unglazed, rather than glazed, tile is the first commercially marketable product and the cost of glazing should be excluded from the depletion base.

At the time in the production process that the glazing solution is applied to a particular tile it has not yet been burnt in the kiln. Its status as a physical entity is simply a mass of raw material, and it is clearly not a commercially marketable product. When the burning process is completed the tile comes out glazed, and this is the first time that that particular tile is commercially marketable.

It is on this basis that it could be argued that glazing is a necessary treatment process in obtaining a commercially marketable product. On the other hand, it can be argued with equal force that if the clay had been burnt without the glazing solution a commercially marketable product would still have been the end result. In fact, about 65% of taxpayer's tile was unglazed and only the remaining 35% was glazed. In my judgment glazing was not necessary to obtain a commercially marketable product and, therefore, is not a necessary treatment process.

Taxpayer urges that the language of the statute "product or products" permits the inclusion of the total manufacturing cost of more than one product. This may be true where there is a basic difference between the products. But here, where it is the same product in an improved form, this argument lacks merit. Adopting taxpayer's viewpoint, it could gold plate or stud the tile with diamonds. It is not believed that these additives could be considered in arriving at a proper depletion base.

When it has been determined, as here, that the first commercially marketable product was secured, namely unglazed tile, this ends the matter and taxpayer may not include any unnecessary improvement costs in computing its depletion base.

Taxpayer cites United States v. Elgin-Butler Brick Co., 57–1 U.S.T.C. Par 9619 (CA 5, 1957) certiorari denied United States v. Merry Bros. Brick & Tile Co., 1957, 355 U.S. 824, 78 S.Ct. 31, 2 L.Ed.2d 38, in support of its contention that the value of both glazed and unglazed burnt clay products f. o. b. plant loaded for shipment was allowed as the depletion deduction basis.

The affirmance in this case was entered by stipulation, on the authority of United States v. Merry Bros. Brick & Tile Co., 5 Cir., 1957, 242 F.2d 708. In the Merry Bros. case the question of glazing did not exist, and was not considered or discussed in the memorandum opinion in the Elgin-Butler case.

There can be no serious argument that dry pressing is not an ordinary and necessary process. Dry pressing is an alternative method of forming tile in the pre-kiln process, and is slightly less expensive than the extrusion method of forming.

Plaintiff produces a small ceramic mosaic tile which it mounts on larger paper sheets in prescribed patterns. Testimony was given that these small tiles could not be commercially marketed unless they were mounted in this manner, due to the extreme difficulty which would be encountered in attempting to set them individually. The nominal sales of loose mosaic tile for "do-it-yourself" purposes does not alter the fact that this mounting is an ordinary process.

The serious question is whether this mounting can be considered to be a treatment process within the purview of the statute. Webster's New International Dictionary (2nd Ed.) defines "treat" as:

"7. * * * often, to subject (a natural or manufactured article) to some process to improve appearance, taste, usefulness, etc; * * *."

Applying this definition to mounting it can be considered a treatment process, in that it imparts usefulness to the otherwise commercially unmarketable mosaic title.

Finally, there is the question of packaging. I cannot consider packaging to be an ordinary treatment process necessary to obtain a commercially marketable product. Packaging does not come within the scope of the term "treatment", in that nothing is done to the tiles themselves. Furthermore, it is not necessary to make the tiles commercially marketable. It is true that in order to get the product to the ultimate consumer it must be packaged, but it is likewise necessary that the product be shipped before it reaches the consumer. It is not understandable how shipment can be held to be a treatment process. Packaging ought to be considered as the same type of activity as shipping.

There is respectable authority in favor of allowing packaging costs to be included in the depletion base. There are twelve decisions by the Fifth Circuit Court of Appeals [representative of which are United States v. Elgin-Butler Brick Co., 57–1 U.S.T.C. Par. 9619 (1957); United States v. Merry Bros. Brick & Tile Co., 5 Cir., 1957, 242 F.2d 708; United States v. Cherokee Brick & Tile Co., 5 Cir., 1955, 218 F.2d 424] holding the sales price of burnt clay products f. o. b. plant loaded for shipment to be the proper depletion base. Accord: United States v. Sapulpa Brick & Tile Corp., 10 Cir., 1956, 239 F.2d 694; Lovell Clay Products v. United States, D.C.Wyo., 1957, 167 F.Supp. 891; Cf. United States v. Dragon Cement Co., Inc., 1 Cir., 1957, 244 F.2d 513, certiorari denied 1957, 355 U.S. 833, 78 S.Ct. 50, 2 L.Ed.2d 45; Riverton Lime & Stone Co. v. Commissioner,

No. 49, 1957, 28 T.C. 446; International Talc. Co. v. Commissioner, No. 128, 1950, 15 T.C. 981; New Idria Quicksilver Mining Co. v. Commissioner, 9 Cir., 1944, 144 F.2d 918.

In United States v. Utco Products, Inc., 10 Cir., 1958, 257 F.2d 65, and Monolith Portland Cement Co. v. United States, D.C.S.D.Cal.1958, 168 F.Supp. 692, a contrary result was reached which I believe is supported by better reasoning and is more in accord with the purpose of the statute.

Accordingly, the depletion base may be arrived at by taking the value of the finished products f. o. b. plant loaded for shipment less the value of packaging and glazing. The parties will recompute the refund claim in accordance with the views herein expressed and judgment will be against the Government therefor.

This memorandum is adopted as findings of fact and conclusions of law.