**STANDARD CLAY MANUFACTURING COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 16326.

United States District Court
W. D. Pennsylvania.
July 8, 1959.

John D. Ray, Beaver, Pa., for plaintiff.

Peter J. Donahue, Special Asst. Dept. of Justice, Washington, D. C., George Sewak, Asst. U. S. Atty., Pittsburgh, Pa., for defendant.

MARSH, District Judge.

Plaintiff brought this action pursuant to § 1346(a) (1), 28 U.S.C.A., to recover income taxes in the amount of $65,-747.28 alleged to have been erroneously and illegally collected by the defendant for the taxable years 1953, 1954 and 1955.[1] The defendant counterclaimed for an alleged underpayment of the 1955 tax. Upon due consideration of the stip-

ulations, evidence and briefs, the court makes the following

## Findings of Fact

1. Plaintiff is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and having its principal place of business in Fallston, Beaver County, Pennsylvania, within this district.

2. During the years in question, the plaintiff was in the business of mining fire clay from an underground mine. In a plant adjacent to the mine, it processed this clay into a variety of burnt clay products, including building brick, face brick, fire brick, ladle brick and facing tile; also a negligible amount of clay was ground and screened and sold in bags.

3. The clay which plaintiff extracted from its mine was a plastic fire, or refractory, clay having a pyrometric cone equivalent (P. C. E.)[2] ranging from 19 to 29. This clay was suitable for making low-duty fire clay brick and low-duty fire clay mortar.

4. Plaintiff mined and used, for the purposes of manufacturing brick, tile, fire brick and other similar products, fire clay in the following quantities:

| 1953 | 40,218.97 | tons |
| 1954 | 40,651.25 | tons |
| 1955 | 44,220.863 | tons |

5. Out of the total tons mined, the following quantities were sold, ground and screened, to customers at prices ranging from $10 to $15 a ton:

| 1953 | 24.6 | tons |
| 1954 | 62.23 | tons |
| 1955 | 13.681 | tons |

These sales averaged, during the 3 years involved, less than 1/10 of 1% of the total amount of fire clay mined.

1. The parties have agreed that the court's decision in this case will also control the disposition of Eastvale Clay Products Company v. United States, Civil 16805, now pending in this court.

2. P.C.E. is a measurement of a clay's refractoriness or ability to withstand deformation at high temperatures.

6. Plaintiff's total sales of finished products manufactured from fire clay mined by it were as follows:

| 1953 | $665,384.32 |
| 1954 | 689,806.75 |
| 1955 | 692,583.52 |

7. During the years in question the following approximate amounts of fire clay were sold by other producers within a 40-mile radius of plaintiff's mine:

| 1953 | 409,527 tons |
| 1954 | 333,736 tons |
| 1955 | 483,464 tons |

8. The tonnages listed in Finding No. 7 include sales of crude as well as ground and screened fire clay.

9. The selling prices of the clay listed in Finding No. 7 ranged from $1.22 to $15 per ton.

10. Plaintiff's clay has unique properties which make it somewhat different from other plastic fire clays generally used to make brick and tile. When plaintiff's clay is burned to make brick and tile, it develops iron spots on the surface. These products are durable, their surface is impervious, they keep clean and maintain their shade and color, and, most uniquely, the iron spots which develop on the surface are a highly desirable feature. As a result of these properties and the fact that plaintiff controls its source of clay supply (which enables it to choose clay according to the color of the finished product desired), the brick and tile produced are ideal for so-called progressive building, i. e., where buildings have been made with plaintiff's brick or tile, additions may be made to such buildings many years later by using the identical color and shade of plaintiff's brick or tile so that there is a substantial matching of the new and old parts of the structure. This matching is more difficult with other clays generally used in the making of brick and tile.

11. Only two other plants are known to be able to produce iron spot brick and tile which are competitive with plaintiff's products. Those plants are located in the immediate vicinity of the plaintiff's plant and extract the same type of unique clay from mines adjacent to plaintiff's mine.

12. Because of the unique properties of plaintiff's clay, the iron spot brick and tile produced bring a higher price than other building brick and tile in a large part of the United States, including the area from the Atlantic Seaboard to the Mississippi River and a substantial area beyond.

13. The fire clay mined by other known producers does not have the unique properties possessed by plaintiff's clay.

14. Plaintiff has never purchased any clay for use in the production of its products.

15. In mining its clay and producing its burnt clay products, plaintiff applied the following processes: blasting and removing the clay from the face of the seam, loading and transporting by car to the mine opening, transportation by chute to grinders, grinding and screening, mixing the clay with water, processing the mixture into brick, tile and other shapes, drying, burning and loading the finished products for shipment.

16. The foregoing are the ordinary treatment processes normally applied by mine owners to produce the burnt clay products sold by plaintiff; they are the usual and ordinary processes by which fire clay normally and generally is processed into brick, tile, fire brick and other related products.

17. The aforementioned processes were necessarily applied by the plaintiff in order to obtain its first commercially marketable products, i. e., those which it could sell at a profit.

18. The burnt clay products which plaintiff produced and sold during the years in question were the first commercially marketable mineral products obtained from the clay which plaintiff mined.

19. During the years in question plaintiff did not sell and could not have sold its crude fire clay at a profit.

20. All except two[3] of the strip miners who produced and sold fire clay in the aforesaid 40-mile radius were primarily engaged in the business of strip mining for coal. Seams of fire clay are found above and below seams of coal. In some cases the fire clay which was removed by the strip miners in order to obtain the coal was dumped or thrown away, and in some cases it was sold as a by-product. In all cases where strip miners produced and sold fire clay in this area, they had "cover" or overburden to remove in the stripping operation which was a fraction of the thickness of the overburden or cover lying over the seam of fire clay in plaintiff's underground mine.

21. Plaintiff's average cost per ton of plastic fire clay mined during the years in question was $3, which included extraction, grinding and screening. The average cost per ton of plastic fire clay mined from strip mines, in conjunction with coal, by other miners in the area during those years was less than plaintiff's cost of mining, grinding and screening. With the added expense of transporting the clay to purchasers, it was not economically feasible for plaintiff to mine its clay and sell it ground and screened. Plaintiff did not mine coal but used the coal vein as the roof of its mine.

22. During the years in question, no commercial market existed for the crude clay mined by the plaintiff.

23. During the years in question, no commercial market existed for plaintiff's ground and screened clay.

24. Generally, in eastern Ohio and western Pennsylvania, during the years involved, the refractory and fire clay mined was put in the form of burnt clay products before it was sold. Most of the producers of such products have their own clay supply.

25. Generally, in eastern Ohio and western Pennsylvania in the years involved, the refractory and fire clay mine owners and operators put their clay in the form of burnt clay products in order to make such fire clay commercially marketable.

26. The plaintiff timely filed income tax returns for the taxable years 1953, 1954 and 1955, and paid the taxes which those returns indicated were due.

27. For the taxable years of 1953 and 1954, the plaintiff computed its depletion allowance on the basis of a $10-per-ton market price for its fire clay. The Internal Revenue Service determined that the market price for fire clay during those years was $5 per ton, and assessed appropriate deficiencies and interest, which were paid by the plaintiff.

28. For the taxable year 1955, the plaintiff computed its depletion allowance on the basis of a $5-per-ton market price for its fire clay. On September 19, 1958, a deficiency was determined by the Internal Revenue Service on the ground that the representative field price for fire clay was $2.75 per ton. Plaintiff waived assessment and the Government assessed the tax and counterclaimed for the deficiency so determined.

29. The plaintiff duly filed with the Commissioner of Internal Revenue claims for refund for each of the years in issue. Those claims for refund were never disallowed by the defendant, but more than six months has passed since their filing.

## Discussion

In this action plaintiff contends, primarily, that its gross income from fire clay should include the gross sales of all its burnt clay products. In the alternative, it contends that if a commercial market is found to have existed for its fire clay, the market prices therefor ranged from $10 to $15 per ton, and that its gross income for the years involved should be computed on those figures.

3. One of the two was American Fire Clay & Products Company, whose principal product was a "bloating" fire clay in demand for special steel mill purposes for which plaintiff's fire clay was not suitable. The Record is not clear as to the type of clay produced by West Darlington Clay Company, the other of the two.

The defendant contends that plaintiff's fire clay was its first commercially marketable mineral product, and since the representative market price therefor in the taxable years 1953 and 1954 was less than $5 per ton, and for the taxable year 1955 was approximately $2.78 per ton (computed on the basis of a weighted average of the clay mined and sold in plaintiff's marketing area), those prices should be utilized in computing plaintiff's gross income.[4] Defendant contends that the complaint should be dismissed and its counterclaim granted for the year 1955.

In my opinion, upon the authority and reasoning of Cannelton Sewer Pipe Company v. United States, 7 Cir., 1959, 268 F.2d 334; Sparta Ceramic Company v. United States, D.C.N.D.E.D.Ohio 1958, 168 F.Supp. 401;[5] and the precedents cited in those decisions, the plaintiff's primary contention should prevail.

Plaintiff's gross income from mining includes income derived from "ordinary treatment processes normally applied" to obtain its burnt clay products, § 114(b) (4) (B) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 114(b) (4) (B)[6] and § 613(c) (1) and (2) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 613(c) (1, 2), those products being its first "commercially marketable" mineral products.

It is true that within a 40-mile radius of plaintiff's mine there were substantial sales of fire clay in its crude form, as well as ground and screened. Without doubt, those sales established a market for fire clay, but plaintiff could not and did not compete profitably therein due to its high cost of mining to which transportation expenses must be added. Thus, I conclude that plaintiff did not have a "commercial" market for its fire clay within the meaning of the cited sections of the Codes during the years involved.

Conclusions of Law

1. The court has jurisdiction of the parties and the subject matter, and all the procedural requirements for maintaining this action have been met.

2. The clay extracted by plaintiff from its deep mine in Fallston, Pennsylvania, during 1953 was refractory and fire clay within the meaning of § 114(b) (4) (A) (iii) of the Internal Revenue Code of 1939, and during the years 1954 and 1955 was refractory and fire clay within the meaning of § 613(b) (6) of the Internal Revenue Code of 1954, and plaintiff is entitled to a deduction for depletion equal to 15% of its "gross income from the property" during the taxable years, limited to 50% of its net or taxable income (computed without allowance for depletion). § 114(b) (4) (A) of the Internal Revenue Code of 1939; § 613(a) of the Internal Revenue Code of 1954.

3. Plaintiff's "gross income from the property" during the taxable years was plaintiff's sales of the burnt clay products that it manufactured from its fire clay, plus plaintiff's sales of the negligible quantities of its ground and screened fire clay, during said years.

4. All the processes applied by plaintiff to its fire clay to obtain building brick, tile, fire brick, and other similar

---

4. In the alternative, defendant also contends that if the evidence does not justify a finding of the representative market price for 1955 that the proportionate profits method should be used. See: Treasury Regulations 118, § 39.23(m)–1(e) (3); 26 C.F.R. 39.23(m)–1(e) (3).

5. An appeal to the Sixth Circuit is pending.

6. In its pertinent part § 114(b) (4) (B) of the 1939 Code provides:

"(B) *Definition of gross income from property.* As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. * * *"

The provisions of § 613(c) (1) and (2) of the 1954 Code are substantially identical.

products are "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products" within the meaning of § 114 (b) (4) (B) of the Internal Revenue Code of 1939 and § 613(c) (2) of the Internal Revenue Code of 1954.

5. Plaintiff has overpaid its income taxes for the years 1953, 1954 and 1955 and is entitled to recover from defendant the overpaid amount in each year and interest thereon heretofore assessed against, and collected from, plaintiff by defendant, with interest thereon from the dates of payment thereof as provided by law, together with all allowable costs of suit.

6. The counterclaim filed by defendant should be dismissed.