**J. E. RILEY, Appellant,**

v.

**R. L. DOUGLASS, Collector of Internal Revenue, Appellee.**

**Gertrude B. RILEY, Appellant,**

v.

**R. L. DOUGLASS, Collector of Internal Revenue, Appellee.**

**Nos. 13504, 13505.**

United States Court of Appeals, Ninth Circuit.

April 1, 1955.

Woodburn, Forman & Woodburn, Reno, Nev., for appellants.

H. Brian Holland, Asst. Atty. Gen., Carolyn Just, Ellis N. Slack, William B. Waldo, Special Assts. to Atty Gen., Mad-

ison B. Graves, U. S. Atty., Las Vegas, Nev., for appellee.

Before POPE and CHAMBERS, Circuit Judges, and CLARK, District Judge.

CHAMBERS, Circuit Judge.

This is a consolidated appeal of the separate cases of a husband and his wife on an income tax depletion-gross income question decided in the United States District Court of Nevada in favor of a collector of internal revenue.

J. E. Riley and Gertrude B. Riley, husband and wife, operated during the latter part of 1943 and during 1944 in Humboldt County, Nevada, what is known as the Riley mine, a low grade tungsten mine. Production was made economically possible for the two years in question by a federal government program of purchase of strategic metals through Metals Reserve Corporation, a subsidiary of the government's Reconstruction Finance Corporation. Rileys were "new producers" as defined by the government subsidiary. All of their production went to Metals Reserve during the two years under review.

The operation of Rileys was about as follows: They removed crude ore from the mine and trucked it to a government stockpile of crude ore located at the Pinson ranch, about two miles distant from the Riley mine. Eventually the government caused the ore to be removed to the Getchell mill which is described as about four miles from the Riley mine. The Getchell mill was privately owned and we assume it was constructed before World War II. Evidently this mill was primarily built for Getchell's own mining product. Apparently, Getchell was a tungsten producer during the war and also did custom work at the mill for Metals Reserve on ores such as came from the Riley mine. Of course, the product of the mill was concentrates. These concentrates were shipped to a stockpile area for concentrates near Salt Lake City where they were further processed. It appears that much of the Riley ore was not milled before 1945 and perhaps at a time when Rileys had ceased to operate their mine.

The first harbinger of the government program was a circular. Then to make a deal with a producer, Metals Reserve prepared a form letter addressed to itself which the producer would sign. Upon receipt of the letter Metals Reserve would not "accept" but would endorse "confirmed." This procedure Rileys and Metals Reserve followed.

Under the program in the pursuit of the war effort, Metals Reserve would accept delivery of crude ore or concentrates. Here Rileys, although they delivered crude ore, claim that what they sold to the government was concentrates. Without considering that contention for the moment, it is well to outline how payment for the Riley product was made. There seems to have been sort of a "gross price" and, after many deductions, a "net price." [1] As a "gross price" the Rileys were entitled to $30.00 per short ton unit, dry weight, of recoverable $WO_3$ (tungsten tri-oxide). A ton of ore with 20 pounds of $WO_3$ would contain a short ton unit, and this would be 1% ore. The Riley ore ran about six-tenths of one percent $WO_3$ according to the assays. This was the first deduction from $30.00. Then it was estimated and agreed to by Rileys and Metals Reserve that the Riley ore's tungsten content was 85% recoverable. [2] That made a further 15% reduction. Also, usually there was moisture in the Riley ore which required the third percentage deduction from the gross unit price.

1. "Gross price" and "net price" are not used in any of the agreements or in the applicable statutes in this case.

2. Out of the actual mineral content in each lot of ore there was always a percentage not recoverable. (This factor is not to be confused with the assay factor of percentage of mineral content that is involved in the first deduction from $30.00.) This agreement on percentage of recoverability stood whether the actual experience on recoverability ran above or below the original estimate.

After percentage deductions came a deduction from the "gross price" of a milling charge of $3.00 per ton of ore, a freight charge of $1.00 per ton, and a chemical treatment charge of $2.00 per short ton unit. The freight charge covered transportation from the first stockpile to the Getchell mill. (The charges deducted from the gross price were not the amount Metals Reserve actually paid out, but were set up in advance as what Metals Reserve estimated it would have to pay. The deductions so established were flat to the producer except that the chemical charge was adjusted up or down in proportion to the content of tungsten tri-oxide actually present in the ore.)

It should also be stated that when crude ores were brought to the Pinson ranch, manual assay samples were taken at frequent intervals. Final settlement was not immediately made upon the basis of the assays of the samples of the crude ore, but was to await the results of milling.[3] However, Metals Reserve did promptly make in 1943 and 1944 provisional payments (with accompanying deductions) in cash to the extent of 80% of what the first assays indicated on the respective lots of ore. Presumably 20% was retained to adjust for error between the samples and results. Some time after 1944 the government negotiated a settlement of the balance due to Rileys without some of the ore being yet milled.

The question before the trial court for decision and here for review is whether Rileys may take a 15% depletion allowance on their income tax returns for the years 1943 and 1944, as to 80% of the gross price, or are limited to computing it on 80% of the net price (80% being the amount of the provisional settlement). In other words, the basic question is may they compute 15% depletion on the amount of milling charges, chemical charges and freight charges perhaps on, but not necessarily limited to, the theory that they constructively

received and paid out moneys for these charges as ordinary mining expenses. Involved is 26 U.S.C.A. § 114 on depletion. As effective for the years in question, it read:

"(1) *General rule.* The basis upon which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property, except as provided in paragraphs (2), (3), and (4) of this subsection.

.  *  *  *  *  *  *

"(3) *Percentage depletion for oil and gas wells.* In the case of oil and gas wells the allowance for depletion under section 23(m) shall be 27½ per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph.

"(4) *Percentage depletion for coal, fluorspar, flake graphite, vermiculite, beryl, feldspar, mica, talc, lepidolite, spodumene, barite, ball and sagger clay, rock asphalt, and metal mines, potash, and sulphur*

"(A) *In general.* The allowance for depletion under section 23(m) shall be, in the case of coal mines, 5 per centum, in the case of metal mines, *  *  * 15 per centum, and in the case of sulphur mines or deposits, 23 per centum, of the gross income from the property during the

---

3. It should be noted that four lots of Riley ore were taken directly to the Getchell mill and promptly milled. This was roughly about 15% of the total. These deliveries were a variance from the usual pattern.

taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. * * *

"(B) *Definition of gross income from property.* As used in this paragraph, the term 'gross income from the property' means the gross income from mining. The term 'mining', as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term 'ordinary treatment processes', as used herein, shall include the following: * * * and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation * * * or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores. * * * "

We think it is probable that if Rileys had milled and treated their own ore as Getchell did its own, then Rileys would have been entitled to depletion on the full amount (gross income) it received from the sale of concentrates. Likewise, the same would likely be true if Rileys had taken their product to a custom mill and themselves employed the miller for a fee.

Should Rileys be penalized for not owning a mill or not themselves employing a custom miller? We think we have here an extremely close question and one about which no one can be dogmatic. Counsel for the parties see no doubt about the question. We have carefully considered New Idria Quicksilver Mining Co. v. Commissioner of Internal Revenue, 9 Cir., 144 F.2d 918; United States v. Cherokee Brick & Tile Co., 5 Cir., 218 F.2d 424. Neither of these two cases appears to determine our problem here, but both are helpful.

We think it well to list some factors relied upon by one side or the other which we deem not important:

(1) The fact that Rileys without the depletion sought by this suit have more than recovered the cost of the mine under the amount of depletion in which the government acquiesces.

(2) The exact time or place that title to the Riley product passed.

(3) The fact that the hauling charges and milling charges paid by the government on the Riley product were not exactly what it charged Rileys.

(4) The fact that a provisional settlement was made instead of just one final settlement.

(5) The fact that the government purchase program created a market for something that would not have been commercially marketable except for the program.

We do not set forth the circulars under which Rileys made their statement or offer in letter form (prepared by the government) which proposition was "confirmed" by the government. The circulars made it clear that the government would "receive" either crude ore or concentrates. "Receiving," however, is not conclusive on the question of what was sold.

As we read the basic documents of the transactions here involved where we have delivery of crude ore to the government we do not think the documents settle the question of whether Rileys sold crude ore or the tungsten content, that is, that which eventually became concentrates. Therefore, we believe, it was a question of fact under all

of the circumstances whether the appellants sold crude ore or the ultimate product, concentrates. The trial court has found, as we understand the findings, that crude ore was sold. We cannot say this is clearly erroneous, although we think it was here within the range of the trial court's discretion to have found that what the government bought from Rileys was concentrates. Had the basic agreements expressly said, "This is deemed a sale of crude ore," we do not believe the other provisions or anything in the oral evidence received would have vitiated the statement. Likewise, had they said unmistakably that a sale of concentrates was intended we cannot say that the fact the difference between the net sales price and the gross sales price never came into the possession of the seller would preclude the seller from depleting the gross sales price.

No doubt here the tailings from the ore after the concentrates were removed were useless and a burden. But suppose they were valuable. To whom did they belong? We think it is inherent in the trial court's findings that these tailings belonged to the Metals Reserve if it wanted them, and that Rileys sold crude ore the value of which was to be determined by the ultimate results on mineral content.

The Cherokee Brick case, supra, holds the company's bricks (a finding of fact) to be the first "commercial product" and, therefore, that the total sale price was subject to depletion. We think it is inherent in 26 U.S.C.A. § 114 that a producer cannot carry his depletion beyond the stage of production where he sells his product. A second limitation is that he cannot retain his product, and go on with successive production steps beyond the point where a commercially marketable product has been obtained and still deplete his ultimate product. Here in Riley, had the trial court found that the producer sold concentrates the question of fact of Cherokee Brick would have been before the trial judge, i. e., had processing gone beyond the point where a commercial product had been obtained.

In Cherokee Brick it was agreed that only a negligible amount of brick clay and tile clay is sold as such. We think it inherent in Cherokee Brick that if the brick company had made one of these negligible sales of clay it would have been limited to depleting what it sold. Likewise in the New Idria case, if the company had sold the ore per se before applying beneficiation processes, we believe this court would have limited the depletion to what was received from what was sold.

The judgments of the district court are affirmed.