**UNITED STATES of America,**
**Appellant,**

v.

**SAPULPA BRICK AND TILE CORPO-**
**RATION, Appellee.**

**No. 5460.**

United States Court of Appeals
Tenth Circuit.

Dec. 20, 1956.

Hilbert P. Zarky, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Tulsa, Okl., Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Sheldon Fink, Atty., Dept. of Justice, B. Hayden Crawford, U. S. Atty., and Russell H. Smith, Asst. U. S. Atty., Atlanta, Ga., on the brief), for the United States.

Joseph B. Brennan, Atlanta, Ga. (Harold E. Rorschach, Willis B. Snell and Sutherland, Asbill & Brennan, Washington, D. C., on the brief), for appellee.

Before PHILLIPS, MURRAH and LEWIS, Circuit Judges.

PHILLIPS, Circuit Judge.

Sapulpa Brick and Tile Corporation[1] brought this action against the United States on a claim for refund of income taxes paid for the year 1953. The taxpayer is engaged in the business of mining brick and tile clay and processing it into burnt brick and tile. The taxpayer owns in fee simple a tract of land upon which its clay pit and brick and tile plant are located. In making burnt brick and tile, the taxpayer carries out the following processes:

(a) The clay is mined by a power shovel and loaded into dump cars which carry the clay to the plant adjoining the clay pit;

(b) The clay is dumped from the cars into a dry pan crusher which mixes the clay and reduces the large chunks to a size which can be carried on an elevator belt;

(c) The clay is discharged from the dry pan crusher onto the elevator belt which carries it to a screen;

(d) The clay passes through the screen into a bin; from the bin the clay passes into a feeder;

(e) The clay is discharged from the feeder into the pug mill which is a machine wherein water is added as the final tempering process;

(f) From the pug mill the clay passes into the brick machine. It first goes into an evacuation chamber where air is evacuated from the clay by a vacuum pump. The clay then passes into the extrusion section of the machine where it is forced under pressure through various types of dies in long ribbons;

(g) The long ribbons of clay, as extruded through the dies, pass into the cutting machine which cuts them into clay units of the desired size;

(h) The clay units, as cut, pass onto a conveyor belt and are then stacked on dryer cars, which are moved to the dryer tunnels, where free water is evaporated from the clay units by open gas fires;

(i) When the free water is thus removed the clay units are stacked in periodic kilns;

(j) The clay units are then burned by natural gas fires in these periodic kilns;

(k) The burnt brick and tile is re-

1. Hereinafter called the taxpayer.

moved from the kilns and thereafter is loaded for shipment to purchasers.

The processes above enumerated are the usual and ordinary ones by which clay extracted from the ground is processed into finished brick and tile. The taxpayer sells the clay which it mines only in the form of burnt brick and tile.

Of all the clay mined in the United States to be used in making brick, tile, and kindred products, there is opportunity for the sale of only a negligible quantity before it is processed into burnt brick, tile, or kindred products, and the owners and operators of clay pits from which clay is mined for use in making burnt brick, tile, and kindred products normally must process such clay into burnt brick, tile, or kindred products in order to obtain a product which they can market commercially.[2]

A revenue agent allowed the taxpayer a percentage depletion deduction for its clay pit, based on the following method of computation. He computed the ratio of the taxpayer's direct labor costs for the processes (a) through (d), inclusive, (that is, until the clay entered the pug mill machine) to all direct labor costs of the taxpayer's operation and arrived at a percentage of 14.58. He multiplied such percentage by the selling price f. o. b. plant, loaded for shipment, of taxpayer's burnt brick and tile, to arrive at taxpayer's "gross income from mining." He multiplied such amount by five per cent, arriving at a depletion allowance of $2,640.52.

On June 23, 1955, the taxpayer filed a claim for refund of income tax for 1953, on the ground that under § 114 of the Internal Revenue Code of 1939[3] it was entitled to a percentage depletion deduction on its deposit of brick and tile clay, computed on the basis of the selling price f. o. b. plant, loaded for shipment, of the burnt brick and tile it produced. The claim of the taxpayer was disallowed.

The district court sustained the taxpayer's contention and concluded that the taxpayer was entitled to a deduction for depletion equal to five per cent of $362,211.88, the amount realized from the sale of its burnt brick and tile in 1953, being $18,110.59, and that the taxpayer had overpayed its income taxes for 1953 in the amount of $8,779.97. From a judgment for that amount, with interest, in favor of the taxpayer, the United States has appealed.

26 U.S.C.A. § 23 in part provides:

"§ 23. *Deductions from gross income.* In computing net income there shall be allowed as deductions:

\* \* \* \* \*

"(m) *Depletion.* In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. \* \* ."

26 U.S.C.A. § 114(b) (4) in part provides:

"(4) *Percentage depletion for coal and metal mines and for certain other mines and natural mineral deposits*

"(A) *In general.* The allowance for depletion under section 23(m) in the case of the following mines and other natural deposit shall be—

"(i) in the case of sand, gravel, slate, stone (including pumice and

---

2. The total amount of clay sold during the years 1951 to 1953, inclusive, to be used in making brick, tile, and kindred products, was only 1.39 per cent of all clay used in the United States in making burnt brick, tile, and kindred products. Most of the clay so sold was fire clay. The taxpayer's clay is not fire clay. The amount of clay sold during the period 1951 to 1953, inclusive, exclusive of fire clay, was only 0.62 per cent of the national output of clay used in making such products.

3. 26 U.S.C.A. § 114.

scoria), brick and tile clay, shale, oyster shell, clam shell, granite, marble, sodium chloride, and, if from brine wells, calcium chloride, magnesium chloride, and bromine, 5 per centum,

"(ii) in the case of coal, asbestos, brucite, dolomite, magnesite, perlite, wollastonite, calcium carbonates, and magnesium carbonates, 10 per centum,

"(iii) in the case of metal mines, aplite, bauxite, fluorspar, flake graphite, vermiculite, beryl, garnet, feldspar, mica, talc (including pyrophyllite), lepidolite, spodumene, barite, ball clay, sagger clay, china clay, phosphate rock, rock asphalt, trona, bentonite, gilsonite, thenardite, borax, fuller's earth, tripoli, refractory and fire clay, quartzite, diatomaceous earth, metallurgical grade limestone, chemical grade limestone and potash, 15 per centum, and

"(iv) in the case of sulfur, 23 per centum, of the gross income from the property during the taxable year, * * *.

"(B) *Definition of gross income from property.* As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, * * *. The term 'ordinary treatment processes', as used herein, shall include the following: (i) In the case of coal—cleaning, breaking, sizing, and loading for shipment; (ii) in the case of sulphur—pumping to vats, cooling,

breaking, and loading for shipment; (iii) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores. * * ."

■ The applicable statutory language is clear and unambiguous. It clearly means that gross income from mining includes the income from treatment processes, which must normally be applied to the mineral to obtain "the commercially marketable mineral product or products," that is, to obtain the first product which is commercially marketable. Here, that first product is burnt brick and tile.[4]

■ The phrase "and ores" in that portion of § 114(b), supra, dealing with specific processes, does not embrace clay. Ore is a material containing valuable metallic constituents which are extractable therefrom. Brick and tile clay, such as is involved in the instant case, contains no valuable metallic constituent which can be extracted therefrom.

Accordingly, the judgment is affirmed.

---

4. See United States v. Cherokee Brick & Tile Co., 5 Cir., 218 F.2d 424 and Townsend v. Hitchcock Corporation, 4 Cir.,

232 F.2d 444, 446. Cf. Dragon Cement Co., Inc., v. United States, D.C.S.D.Me., 144 F.Supp. 188.