AMERICAN GILSONITE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56686. Filed April 29, 1957.

*Elliott Lee Pratt, Esq.*, for the petitioner.
*E. A. Tonjes, Esq.*, for the respondent.

**OPINION.**

LeMire, *Judge:* Petitioner contends that in computing its depletion deduction for the taxable years in question, the respondent erroneously determined that trucking, sacking, pulverizing, and its office at Craig, Colorado, were not a part of the ordinary treatment process, and that the respondent further erred in determining that the loss incurred in the operation of The Bonanza Townsite and the maintenance cost of the house at Vernal, Utah, were direct costs of mining gilsonite. The respective amounts involved have been stipulated and are not in controversy.

Petitioner is a corporation engaged in the mining of gilsonite, a hydrocarbon substance used in the asphalt, ink, and paint industries. The applicable provisions are sections 23 (m) and 114 (b) (4) (A) (iii) and (b) (4) (B) of the Code of 1939. These sections have been construed in a number of cases involving various ores and minerals, but we have been referred to no case involving gilsonite. Depletion was first allowed with respect to gilsonite for the years beginning after December 31, 1946. Act of Aug. 8, 1947, ch. 515, 61 Stat. 917.

The mining operations and the treatment processes carried on by petitioner are fully set forth in our Findings of Fact. They will be referred to only to the extent material to the particular phases in dispute.

The respondent contends that the pulverization of gilsonite is not an ordinary process normally applied by a mine owner. Petitioner sells 90 per cent of its product in the fine and select grades, and the respondent concedes that the cleaning, crushing, sorting, and screening are ordinary treatment processes to obtain the 90 per cent of the commercial marketable mineral product sold. He then argues that as the gilsonite had reached the stage of being a marketable product, the pulverization of the remaining 10 per cent in order to reach a special market does not meet the test of being an ordinary process. We do not agree. No logical distinction appears to us between sorting and sizing into the fine and select grades, conceded to be ordinary processes, and the pulverization which was a concurrent result of the same process with some additional pulverization, if needed. In our opinion, the cases of *International Talc Co.*, 15 T. C. 981, and *Hitchcock Corporation* v. *Townsend*, 132 F. Supp. 785, affd. 232 F. 2d 444, and *Riley* v. *Douglass*, 221 F. 2d 146, relied upon by petitioner, support its contention that the pulverization of its gilsonite constitutes an ordinary process.

The next item relates to the sacking of the gilsonite. The record shows that after the ordinary processes above described have been completed at the mine at Bonanza, Utah, the three sizes of gilsonite are stored in separate bins until the receipt of customers' orders. Upon the receipt of shipping orders, the particular size to be shipped is hauled by truck to Craig, Colorado, where petitioner maintains a plant for packaging the gilsonite into 100-pound paper sacks, which is the form required by the customer. No sacking plant is maintained at Bonanza, and no treatment other than the sacking is carried on at Craig, Colorado.

The respondent contends that the sacking is not an ordinary treatment process, and relies upon the recent decision in *Dragon Cement Co.* v. *United States*, 144 F. Supp. 188, on appeal C. A. 1, where the District Court refused to follow the principle of *United States* v. *Cherokee Brick & Tile Co.*, 218 F. 2d 424, affirming 122 F. Supp. 59 (C. A. 5). See *United States* v. *Merry Brothers Brick & Tile Co.*, 242 F. 2d 718 (C. A. 5), where the Fifth Circuit, after criticizing the *Dragon Cement Co.* decision, *supra*, reaffirms its *Cherokee* decision as sound. See also *United States* v. *Sapulpa Brick & Tile Corporation*, 239 F. 2d 694.

This record establishes that crude gilsonite is not commercially marketable, and the industries purchasing the product require that it be processed and packaged in the form in which petitioner prepares it for sale. The fact that petitioner does its sacking at some distance from its cleaning plant has no bearing on the question as to whether the sacking is an ordinary process normally applied by mine owners

or operators. The respondent erred in determining that the sacking was a cost beyond mining. *International Talc Co., supra, Hitchcock Corporation* v. *Townsend, supra.*

The next item in controversy relates to the cost of transporting the gilsonite from the plant at Bonanza to the railhead at Craig, Colorado. The record shows that the gilsonite, after the aforementioned treatment processes to obtain a commercial product, is transported by specially designed tight trucks to keep it clean and dry to the railhead at Craig, Colorado, a distance of 113 miles from the Bonanza plant.

The respondent contends that the cost of transporting the gilsonite to the railhead is a cost beyond mining. Petitioner argues that if the sacking is held to be an ordinary treatment process, the cost of transporting the product to the sacking plant is likewise an ordinary treatment process. Petitioner also relies on the provision in section 114 (b) (4) (B) which provides that the term "mining" shall include "so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plant or mills * * *." The quoted provision was added to section 114 (b) (4) (B) of the 1939 Code by section 207 of the Revenue Act of 1950, and by section 207 (b) was made effective for taxable years beginning after December 31, 1949. The amendment, if applicable to the facts in the instant case, would not be available to petitioner in its taxable year 1948 here in question.

In *Zonolite Co.* v. *United States*, 211 F. 2d 508, the statute and the applicable regulations prior to the above amendment were construed. It was there held that the cost of transporting the ore from the open pit to the processing plant, a distance of about one-half mile, was not the cost of the ordinary treatment process.

Petitioner transported its gilsonite a distance of 113 miles from its mine. The statute applicable to the taxable years 1950 and 1951 provides a limitation of 50 miles unless the Secretary finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance. This record contains no indication that petitioner has ever made any application for a ruling or that the Secretary has found that petitioner must transport its product a greater distance.

We are not in agreement with petitioner's contention that if the cost of sacking is allowable, the cost of transportation to the sacking plant should also be considered to be an ordinary treatment process. Our holding that the sacking cost was a mining cost, is premised

on the fact that the distance to where the process was performed was immaterial. Petitioner is not entitled to avail itself of transportation costs by choosing to establish its sacking plant a distance in excess of the 50-mile limitation provided by the statute.

We are of the opinion and hold, that the respondent properly determined that the transportation of petitioner's ore a distance of 113 miles from the mine to the railhead is a cost beyond mining.

The next item in controversy pertains to the respondent's determination that the overhead expense of maintaining the Craig office is beyond mining.

The evidence shows that the Craig office is maintained in order to handle the orders for gilsonite and to schedule shipments from the mine to the sacking plant. It also appears that petitioner maintains an office at the Bonanza plant, where the payroll and other office activities are carried out. The only argument petitioner makes with respect to the Craig office expense is that the cost was incidental to the sacking. The burden is upon petitioner to show that respondent's determination was invalid. We do not think the meager facts presented by this record are sufficient to meet that burden. Accordingly, we sustain the respondent's determination as to this issue.

The next item presents the question, whether the costs incident to the operation of The Bonanza Townsite are to be treated as mining costs as determined by the respondent. The record shows that petitioner's mine was located some 4 hours' driving time from the town of Vernal, Utah. The Bonanza Townsite was originally constructed with a view to attracting a labor supply and not as a profit venture. In the taxable years in question, the full capacity of the townsite was occupied by petitioner's employees, about 40 per cent of its employees residing there. The houses were rented for $2.50 per room per month, an obviously low rental. The total income from the operation ranged from a low of $7,275.29 in 1949 to a high of $8,496.83 in 1951. The net loss from operations during the taxable years averaged approximately $25,000 per year.

Petitioner contends that the operation of the townsite is unrelated to the direct mining. The respondent's position is that where nonproducing activities are operated with intent to provide service free or at a price which consistently results in a loss, the gross income used to compute the limitation of percentage depletion should reflect the losses resulting from such activities on the ground that such losses represent an indirect increase in salaries and wages of petitioner's production activities. On the facts before us, we are of the opinion that the respondent's position is sound. While we have been referred to no decision and our own research has not revealed any authority pre-

cisely in point, we think the cases of *Dorothy Glenn Coal Mining Co.*, 38 B. T. A. 1154, and *Repplier Coal Co.* v. *Commissioner*, 140 F. 2d 554, certiorari denied 323 U. S. 736, support the logic and correctness of the rule herein applied.

We, therefore, sustain the respondent's determination with respect to the loss sustained in the operation of The Bonanza Townsite.

As to the small maintenance cost of the house in Vernal, Utah, owned by petitioner, the record discloses the meager fact that petitioner rented the property to any available tenant. We think such single fact is insufficient to carry petitioner's burden of showing that the loss should be separated and excluded from gross income in computing its depletion deduction. We, therefore, sustain the respondent's determination for failure of proof.

*Decision will be entered under Rule 50.*