*Decision will be entered under Rule 50.*

RIVERTON LIME AND STONE COMPANY, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 55005.   Filed May 24, 1957.

*H. Brice Graves, Esq.*, and *H. Merrill Pasco, Esq.*, for the petitioner.
*Charles R. Hembree, Esq.*, for the respondent.

## OPINION.

RICE, *Judge:* Section 114 (b) (4) (A) of the 1939 Code[3] provides that the allowance for depletion in the case of stone shall be "5 per centum * * * of the gross income from the property during the taxable year * * *." Subparagraph (B) defines gross income from

---

[3] SEC. 114.   BASIS FOR DEPRECIATION AND DEPLETION.

(b) BASIS FOR DEPLETION.—

    *        *        *        *        *        *        *

(4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND FOR CERTAIN OTHER MINES AND NATURAL MINERAL DEPOSITS.—

(A) In General.—The allowance for depletion under section 23 (m) in the case of the following mines and other natural deposits shall be—

(i) in the case of * * * stone * * * 5 per centum,

    *        *        *        *        *        *        *

of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property.   Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23 (m) be less than it would be if computed without reference to this paragraph.

(B) Definition of Gross Income From Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining.   The term "mining" as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, * * *

the property as "the gross income from mining * * *," and includes within the term mining "not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * *." In *Black Mountain Corporation*, 21 T. C. 746 (1954), we agreed that the Commissioner, in his regulations, had properly interpreted the phrase "commercially marketable mineral product" to mean the "first commercially marketable mineral product."

The primary issue before us is whether crushed limestone, or pure hydrated hydraulic lime, was the "first commercially marketable mineral product" arrived at in petitioner's production operations.

Petitioner contends that hydrated hydraulic lime was the first commercially marketable product which it produced since no market existed for its limestone until it reached that state. The respondent, on the other hand, argues that the limestone here in issue could have been used in its crushed state for agricultural purposes and that crushed limestone and not hydrated hydraulic lime was therefore the first marketable product which the petitioner produced. He, accordingly, contends that petitioner's depletion allowance must be limited to 5 per cent of the theoretical gross income derived from the sale of crushed stone plus the amount realized from the sale of quarry screenings.

We found as a fact that even though petitioner's crushed limestone could have been used for agricultural purposes, it could not and did not sell the limestone in that state because of its inferior chemical composition and that hydrated hydraulic lime was, therefore, the first commercially marketable mineral product which it produced. We think "commercially marketable" means that there is commerce or trade in a mineral product and that there is an established market in which such product is sold. Here there was neither so far as this particular crushed limestone was concerned. But, even in the face of those facts, the respondent argues that because the crushed stone which the petitioner produced *could* have been used for agricultural purposes, it must compute its allowable depletion on the theoretical gross income supposedly derived from the sale of the crushed stone. It seems to us that the effect of that argument is to read the words "commercially marketable" out of the statute.

As the Court of Appeals said in *United States* v. *Cherokee Brick & Tile Co.*, 218 F. 2d 424, 425 (C. A. 5, 1955) :

The statutory language is clear and unambiguous, which is that gross income from mining must include the income from ordinary treatment processes which must be applied to the ore or mineral in order to obtain the commercially marketable mineral product, that is, the first product which is marketable in commerce.

There is no provision in the statute for excluding any process before such a marketable product is reached. * * *

See also *United States* v. *Merry Brothers Brick & Tile Co.*, 242 F. 2d 708 (C. A. 5, 1957); *United States* v. *Sapulpa Brick & Tile Corporation*, 239 F. 2d 694 (C. A. 10, 1956); *Townsend* v. *Hitchcock Corporation*, 232 F. 2d 444 (C. A. 4, 1956); and *American Gilsonite Co.*, 28 T. C. 194 (1957).

We therefore conclude that the gross income which petitioner derived from the sale of hydrated hydraulic lime plus the income from the sale of quarry screenings is the proper basis for computing its allowable percentage depletion.

The second issue presented for our consideration is the proper method of computing the depletion base. Had all of petitioner's sales been of pure hydrated hydraulic lime, the issue would not exist. Gross income from the property could then have been equated to gross receipts. However, such was not the case. As the record reveals, sales of the product were made in both a pure and a mixed state. Therefore, we must arrive at a figure which most clearly reflects gross income from the pure product, excluding therefrom the costs and proportionate profits attributable to those processes utilized thereafter to produce the mixed product. At best, any figure will be only an approximation since the bulk of petitioner's sales were of the mixed product.

The Code provides that the basis against which the statutory depletion percentage is to be applied is the "gross income from the property." The regulations [4] state:

if the product is * * * processed * * * before sale, "gross income from the property" means the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied,* * *. *If there is no such representative market or field price (as of the date of sale), then there shall be used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes * * * minus the costs and proportionate profits attributable to the * * * processes beyond the ordinary treatment processes.* If the taxpayer establishes to the satisfaction of the Commissioner that another method of computation, other than the computation of profits proportionate to costs, clearly reflects the gross income from the property, then such gross income shall be computed by the use of such other method. [Emphasis supplied.]

Petitioner contends that $19.20 per ton, the minimum price received by it for hydrated hydraulic lime in its pure state during the years in issue, was the representative market price for that product. It computes its gross income from the property by multiplying the

---

[4] For the year 1951, Regulations 111, section 29.23 (m)–1 (*f*) apply; and for the year 1952, Regulations 118, section 39.23 (m)–1 (e) (3) apply.

total tonnage of that product sold in each year, whether in a pure or mixed state, by $19.20, and adds to that figure the amounts realized from the sale of quarry screenings.

Respondent challenges that method. He contends that petitioner has failed to establish that $19.20 was the representative market price per ton for pure hydrated hydraulic lime during the years in issue. He argues that while $19.20 might represent the market price per ton for that small portion of petitioner's total production of hydrated hydraulic lime which was sold in the pure state, it cannot be said to represent the market price for the much greater quantity of that product which was sold in the admixed state. Therefore, he argues, there being no representative market price for "a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied," gross income from the property must be determined on the basis of the market price "of the first marketable product resulting from any process or processes," here the admixed product, "minus the costs and proportionate profits attributable to the * * * processes beyond the ordinary treatment processes."

Accordingly, respondent would apply to petitioner's gross sales, the ratio which the cost of the ordinary treatment processes bears to the entire cost of production. This, he contends, eliminates the costs and proportionate profits attributable to those processes beyond the ordinary treatment processes, as provided by the regulations. He bases his computation on the assumption that petitioner's production costs were proportionate to its profits.

In 1951 petitioner expended $475,391.83 on ordinary treatment processes, or approximately 64 per cent of its total production costs of $747,264.41. In 1952 petitioner expended $466,487.84 on the ordinary treatment processes, or approximately 65 per cent of its total production costs for that year of $714,275.34. Respondent would compute gross income from the property at 64 per cent of petitioner's gross sales for 1951, and 65 per cent of its gross sales for 1952, plus any income resulting from the sales of quarry screenings in the respective years.

This is a peculiar case in that petitioner is the hydrated hydraulic lime industry. Few sales of the pure product were made because hydrated hydraulic lime, unmixed with additives, was no longer used to any large extent in the manufacture of concrete. In effect, the pure product and the admixed product were products which competed with one another. Presumably, had petitioner not produced the admixed product, it could have sold its total hydrated hydraulic lime production in the pure state; but, because it produced a better product by adding cement, waterproofing, and other plasticizing agents, which gave greater strength to the pure lime, that product was more sal-

able and was the one demanded in the construction industry. It is unreasonable to assume, as respondent's computation does, that petitioner could add those commercial components and realize anywhere near as great a markup on their resale as it could realize on its own product—the pure hydrated hydraulic lime—since no further processing of the lime was done when the cement and other plasticizers were added, except for a final grinding of the admixed product.

On this record, we believe petitioner's method of computing the depletion basis to be the proper one. The regulations state that, in the case of a product processed before sale, gross income from the property is to be computed on the basis of the representative market price of a mineral product of like kind as subjected to similar treatment processes. Petitioner has shown that those sales of the pure product which were made were at a minimum price of $19.20 a ton. Inasmuch as no further processing was done after the product reached its pure state, other than the addition of the additives, we conclude that $19.20 a ton represents the fair market price for petitioner's pure hydrated hydraulic lime, and that petitioner's computation based on that figure is acceptable.

*Decision will be entered under Rule 50.*