**DRAGON CEMENT COMPANY, Inc.**

v.

**UNITED STATES of America.**

Civ. No. 4–90.

United States District Court
D. Maine, S. D.

June 23, 1958.

Frederic A. Collins and Robert J. Casey, Clark, Carr & Ellis, Locke, Campbell, Reid & Hebert, Augusta, Me., for plaintiff.

Peter Mills, U. S. Atty., Portland, Me., Gerard J. O'Brien, Dept. of Justice, Washington, D. C., for defendant.

GIGNOUX, District Judge.

This case is here on remand from the United States Court of Appeals for the First Circuit for proceedings not inconsistent with the opinion rendered by that

Court [1] on taxpayer's complaint to recover federal income and excess profits taxes for the period January 1 to November 30, 1951. A brief recital of the history of this litigation is essential to an understanding of the issue now presented to this Court.

Throughout the tax period in question, Lawrence Portland Cement Company, the taxpayer's predecessor, owned and operated two quarries, one in Maine and the other in Pennsylvania, from which it mined calcium carbonate, otherwise known as cement rock. The cement rock was converted into cement clinkers by heating in rotary kilns. The cement clinkers were then ground into powdered cement, which was placed in silos from which it was loaded and shipped in bags or in bulk.

The claim for refund set forth in the complaint raised two questions. The first related to the taxpayer's right to a deductible tax loss under § 23(f) of the Internal Revenue Code of 1939, an issue which is no longer in the case. The second question concerned the amount claimable by the taxpayer as a deduction for percentage depletion under §§ 23(m) and (n) and § 114(b)(4)(A) and (B) of the Code, 26 U.S.C.A. §§ 23(m, n), 114 (b)(4)(A, B). [2]

The dispute under the second question involved the propriety of including the taxpayer's gross income allocable to its kiln and post-kiln processes, by which the cement rock was converted into cement, in its "gross income from mining" for the purpose of determining the base for computing its percentage depletion allowance. The methods used by the taxpayer to transform cement rock into cement were admitted to be the "ordinary treatment processes normally applied by mine owners and operators" who produce cement. The Government contended, however, that mining terminated, and the depletion base was arrived at, when the taxpayer had prepared the cement rock for conversion, and that the subsequent operations, during which the cement rock underwent a chemical change and ceased to be a mineral, constituted a manufacturing process, not allowable in computing the depletion base. The taxpayer's contention was that the first commercially marketable mineral product is cement, and hence the income allocable to the kiln and post-kiln processes by which the cement rock was converted into cement was properly included in the base for computing its percentage depletion allowance. The issue turned solely on the statutory interpretation of the definition of the term "gross income from mining" as contained in § 114(b)(4)(B) of the Code. [3]

The essential facts having been stipulated and both parties having moved for summary judgment, this Court, Aldrich, J., serving by assignment, on September 24, 1956 entered a judgment, [4] the first paragraph of which (as subsequently amended) decreed that the plaintiff recover of the defendant the sum of $10,-546.46, with interest, on account of the deductible tax loss claimed under § 23(f)

1. Dragon Cement Co. v. United States, 1 Cir., 1957, 244 F.2d 513, certiorari denied 1957, 355 U.S. 833, 78 S.Ct. 50, 2 L.Ed.2d 45.

2. The allowance for percentage depletion allowable as a deduction to this taxpayer from its calcium carbonate deposits as provided by §§ 23(m) and (n) and 114(b) (4) (A) of the Internal Revenue Code of 1939, as amended, is 10% of its "gross income from the property". Section 114(b) (4) (B) contains the following definition of the term "gross income from the property": "As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * *"

3. Footnote 2, supra.

4. See Dragon Cement Co. v. United States, D.C.Me.1956, 144 F.Supp. 188.

of the Code, and the second paragraph of which decreed as follows:

2. That plaintiff take nothing further in consequence of plaintiff's complaint as to the issue of percentage depletion and as to that issue, the action be and it is hereby dismissed on the merits.

The taxpayer appealed from that portion of the judgment denying recovery to it under the percentage depletion issue. The Court of Appeals, on May 14, 1957, concurring with the taxpayer's contention that the first marketable product is cement, held (244 F.2d at pages 519–20):

" * * * that the taxpayer is entitled to a percentage depletion deduction based upon its gross income from cement, as the first commercially marketable mineral product obtained from the deposit, calcium carbonate, after the ordinary treatment processes normally applied by such mine owners."

It accordingly directed that judgment be entered vacating that portion of the District Court judgment under review and remanding the case to the District Court for further proceedings not inconsistent with the remanding opinion.

On January 3, 1958 a pre-trial conference was held by this Court for the purpose of considering further proceedings in the case consistent with the opinion of the Court of Appeals. At that conference the parties agreed that all issues of fact and law had been resolved by them "except for the question of whether the taxpayer's deduction for percentage depletion is to be computed upon its gross income from sales of cement in bulk and in bags, or is to be computed upon its gross income from sales of cement as if all were sold in bulk; more specifically, the question of whether the taxpayer is entitled to include in its gross income from cement in the determination of the percentage depletion deduction, the sales price of bags in the amount of $255,237.41 at its quarry and plant at Thomaston, Maine, and in the amount of $247,947.75 at its quarry and plant at Northampton, Pennsylvania." The parties further agreed that this issue should be determined by the Court upon the basis of a stipulation and briefs to be filed by counsel.

In a stipulation subsequently filed by the parties on January 14, 1958, it was agreed that during the tax period involved sales of cement loaded for shipment in bulk produced 49.4% of the taxpayer's total gross income from the sale of cement and constituted 51.6% of its tonnage sold; that sales of cement loaded for shipment in paper bags produced 50.6% of the taxpayer's total gross income from the sale of cement and constituted 48.4% of its tonnage sold; that the paper bag used by the taxpayer is a standard unit in the cement industry for the handling and sale of cement in bags; and that "it was necessary that" the taxpayer "be prepared to load cement for shipment in bags in order to enable it to reach a substantial part of the market for its commercially marketable product, cement loaded for shipment."

The parties further agreed that should the taxpayer prevail on the issue now before this Court, it is entitled to a recovery of $494,229.38, plus interest, and that should defendant prevail the taxpayer is entitled to a recovery of $460,-102.57, plus interest—a difference, before interest, of $34,126.81, the only amount presently in dispute.

To resolve the present issue this Court must first look for guidance to the remanding opinion accompanying the mandate from the Court of Appeals. The remanding opinion contains no specific finding on this question. Implicit therein, however, is a ruling in favor of the taxpayer. After a comprehensive review of the statutory history of the provisions governing the depletion allowance authorized this taxpayer, the Court concluded that the Congress intended not to limit the computation of the percentage depletion allowance to the gross income attributable to purely extractive processes and that the depletion allowance is

not an allowance upon any process or upon any product but is rather an allowance to the mine owner "designed as a simple means to diminish his taxable income from the exploitation of a natural resource which is necessarily exhausted in the process." The Court then stated the issue presented to it as follows (244 F.2d at page 518):

"The dispute here involves the propriety of including income allocable to the kiln and post-kiln processes in gross income from mining, as defined; if such processes are excluded, the depletion allowance for the taxable period would be $204,-859.19, whereas, if such processes are included, the allowable depletion would be $795,852.60."

The above-quoted figures were not accidentally reached. Exhibit "C" to plaintiff's claim for refund, a copy of which is attached to the stipulation filed with this Court, indicates that the figure of $204,-859.19 (the depletion deduction actually allowed) excluded the cost of all kiln and post-kiln processes from plaintiff's gross income for computation of its depletion deduction; and that the figure of $795,-852.60 (the depletion deduction claimed by plaintiff) included in the gross income figure on which the deduction is computed the cost of all kiln and post-kiln processes, one of which is the cost of bags, the treatment of which is here in dispute. The conclusion is thus warranted that the bagging procedure utilized by this taxpayer was considered in the remanding opinion to be one of the post-kiln processes the cost of which was held by that Court to be properly includible by the taxpayer in its gross income for the purposes of the depletion deduction computation.

This conclusion is further substantiated by that portion of the remanding opinion which describes in detail the steps in the kiln and post-kiln processing procedure utilized by the taxpayer in converting the cement rock into ce-

ment. After noting that there is no commercial market for cement rock, the Court continues (244 F.2d at page 517):

"Accordingly, the taxpayer's predecessor had to engage in further processes before obtaining a marketable product, cement, upon which gross income could be realized. The so-called filter cake was run into the upper end of rotary kilns, which were in the form of long rotating cylinders set at a slight inclination, the filter cake gradually traveling toward the lower end of the kiln. Hot gases from a flame at the lower end evaporated the water from the filter cake and burned the remaining material to a dense clinker. The clinker was then conveyed to a grinding mill where it was ground to the fineness of cement; *the cement was finally placed in silos from which it was loaded and shipped in bags or in bulk.*" (Emphasis supplied.)

As previously noted, the Court of Appeals held " * * * that the taxpayer is entitled to a percentage depletion deduction based upon its gross income from cement, as the first commercially marketable mineral product * * * " 244 F.2d at pages 519–520. The foregoing analysis by the Court of the taxpayer's operations clearly indicates that the Court regarded the loading and shipping of the cement in bags or in bulk as a part of the ordinary treatment processes applied by the taxpayer to cement rock in order to process cement rock into "a marketable product, cement, upon which gross income could be realized."

The provisions governing the depletion allowance authorized this taxpayer have been authoritatively interpreted by the Court of Appeals in the remanding opinion to allow a depletion deduction based upon the taxpayer's gross income from all processes which it must normally apply in order to obtain its first commercially marketable mineral product; that is to say, the first mineral product obtained by the taxpayer for which a

commercial market exists.[5] In the instant case the parties have stipulated that "it was necessary that" the taxpayer "be prepared to load cement for shipment in bags in order to enable it to reach a substantial part of the market for its commercially marketable product, cement loaded for shipment." In order to reach its total commercial market, therefore, this taxpayer must be prepared to, and it actually does, load its cement for shipment either in bags or in bulk. During the tax period here involved approximately 50% of taxpayer's cement was actually sold in bags, and it must be inferred from the stipulation that it could only be so sold. Without such packaging the record thus establishes that approximately one-half of plaintiff's product cannot actually be considered to be commercially marketable. Insofar as that portion of this taxpayer's market is concerned, therefore, the bagging procedure is an ordinary treatment process normally applied and essential for the marketing of the mineral product.

■ Where packaging is essential for the marketing of a mineral product, the courts which have ruled on the question have held that it is a part of the ordinary treatment process and the cost is includible in the basis for determining the percentage depletion deduction allowable. Thus in Townsend v. Hitchcock Corp., supra, the Court of Appeals for the Fourth Circuit held that the depletion deduction should be computed on the selling price of powered talc in bags and talc crayons in cartons. The District Court in the Hitchcock case, M.D.N.C. 1955, 132 F.Supp. 785, 787, expressly noted that:

"The evidence is not contradicted that the powder is marketable only in 50 lb. bags and the crayons when

placed in cartons and crated for shipment F.O.B. Murphy, N. C. The purchaser buys powder and crayons; *the containers are incidental but essential for the marketing of the mineral product.* They are necessary expenses for marketing the products, and the gross sales should not be diminished on account of their cost." (Emphasis supplied.)

A similar conclusion was reached by the Tax Court in International Talc Co. v. Commissioner, 1950, 15 T.C. 981, and in American Gilsonite Co. v. Commissioner, 1957, 28 T.C. 194. In the latter case, the Court stated (28 T.C. at page 198):

This record establishes that crude gilsonite is not commercially marketable, and the industries purchasing the product require that it be processed and packaged in the form in which petitioner prepares it for sale. * * * The respondent erred in determining that the sacking was a cost beyond mining.

There remains the final argument advanced by defendant that containers of any sort are not items on which depletion allowance should ever be allowed, and hence that the cost of bags is not includible in determining taxpayer's gross income for purposes of the depletion computation. The answer is shortly stated in the remanding opinion (244 F. 2d at page 516):

" * * * the depletion allowance is not an allowance upon any *process*, whether a mining process or a manufacturing process. Nor is it an allowance, as such, upon any product. Instead, it is an allowance to the mine owner designed as a simple means to diminish his taxable income from the exploitation of a natural resource which is necessarily

---

5. The three other Courts of Appeal which have had occasion to consider this question are in accord. See Townsend v. Hitchcock Corp., 4 Cir., 1956, 232 F.2d 444; United States v. Merry Brothers Brick & Tile Co., 5 Cir., 1957, 242 F. 2d 708, certiorari denied 1957, 355 U.S. 824, 78 S.Ct. 31, 2 L.Ed.2d 38; United States v. Cherokee Brick & Tile Co., 5 Cir., 1955, 218 F.2d 424; and United States v. Sapulpa Brick and Tile Corp., 10 Cir., 1956, 239 F.2d 694.

exhausted in the process. In making this allowance, the Congress has elected not to limit the deduction in all cases to the taxpayer's actual cost or other basis in the land from which the ore or mineral is extracted. To supply a simpler rule, the Congress has turned more and more to the method of percentage depletion, which differs from both cost and discovery value depletion in that it is measured by an arbitrary percentage of gross income from the property, without regard to the taxpayer's cost or discovery value."

■ It is the conclusion of this Court that the use of bags for cement is one of the ordinary treatment processes normally applied by mine owners in the cement industry to obtain their first commercially marketable product and the cost thereof is includible by this taxpayer in determining its gross income for the purpose of computing its depletion deduction. Therefore, upon the Mandate of the United States Court of Appeals for the First Circuit dated the fourteenth day of May, 1957,

It is ordered, adjudged and decreed that so much of the judgment of this Court entered on September 24, 1956 as decrees

That plaintiff take nothing further in consequence of plaintiff's complaint as to the issue of percentage depletion and as to that issue, the action be and it is hereby dismissed on the merits,

is hereby vacated and set aside; that, the cause having been restored to the docket for further proceedings not inconsistent with such Mandate, judgment be and it is hereby entered for the plaintiff in the total amount of $494,229.38, plus interest thereon as provided by law, which sum includes the amount of the amended judgment of October 19, 1956, heretofore entered herein in the sum of $10,546.46.